[No. C052649. Third Dist. June 26, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
LISA MARIE MITCHELL, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I, II, V, VI, and X through XVI of the Discussion.

## COUNSEL

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French and Angelo S. Edralin, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HULL, J.**—Following her three-month employment as a caregiver for Billy C., an elderly and dependent adult, defendant used blank checks, credit cards and identifying information unlawfully taken from Billy to obtain cash, purchase automobiles and acquire other merchandise. She was convicted of 51 offenses, including 22 counts of forgery (Pen. Code, § 470, subd. (d)), four counts of receiving stolen property (*id.*, § 496), three counts of wrongful use of personal identifying information (*id.*, § 530.5), and various drug-related offenses. (Further undesignated section references are to the Penal Code.) Sentenced to an aggregate, unstayed term of 24 years in state prison, defendant appeals, raising 18 separate claims of error, some with subparts. We reject nearly all of these contentions. However, because we agree with a few, we shall reverse her conviction in part.

### FACTS AND PROCEEDINGS

For the most part, the facts in this matter are undisputed. In August 2004, William C. hired defendant to work as a caregiver for his father, Billy C., who was 80 years old and not in good health.

At the time, William C. handled his father's financial affairs. Billy C. had two bank accounts: a "Cash Maximizer Account," from which money could be withdrawn only a few times each month; and a "Senior Checking Account." Payments received by Billy were deposited in his Senior Checking Account. William kept a book of checks for Billy's Senior Checking Account and paid Billy's expenses using those checks. Other checks for the Senior

Checking Account were kept in a box under a desk next to Billy's bed. Also kept in that box were various active credit cards assigned to either Billy or his deceased wife, Barbara C. Billy's wallet with identifying information was kept in a dresser drawer in his bedroom. Various holiday ornaments and decorations were kept in the garage.

Defendant cared for Billy five days a week, living at the home during those days. Another caregiver, Jean M., cared for Billy the other two days. When defendant was not staying at Billy's home, she resided with her sister.

In November 2004, William received a call from Jean M. informing him that defendant was on her way to Billy's home to make the bed. William thought this was unusual because by that time Billy was already in bed asleep. He drove over to Billy's house and found defendant and Jean M. there arguing. William told defendant she was not going to wake Billy up to make his bed and defendant departed.

The next day, defendant called William and asked if she still had her job. William said he would get back to her on it.

On November 28, defendant came into Bailey Motors and selected a 1994 Honda Accord to purchase. However, because the radio did not work, she did not complete the purchase at that time. The same day, defendant went to Attainable Auto and looked at a 1992 Honda Civic.

The next day, November 29, $10,000 was transferred from Billy's Cash Maximizer Account to his Senior Checking Account via a telephone transaction. According to a bank representative, a person can transfer funds from one account to another over the phone if he or she has the last four digits of the account holder's Social Security number.

Also on November 29, defendant returned to Attainable Auto and told the dealer her grandparents were giving her $5,000 to buy a car. The dealer told her the exact amount for the car out the door. Later that evening, around 5:30 or 6:00 p.m., defendant returned with a check drawn on Billy's Senior Checking Account and bought the car. The check was already filled out and signed, although defendant may have filled in the name of the dealership on the check after she arrived. The dealer did not try to verify the check with the bank because the bank was closed. The check was eventually dishonored.

Between 6:00 and 7:00 p.m. that evening, defendant returned to Bailey Motors and, because the radio had been fixed, bought the Honda Accord she had looked at the day before. At the time, defendant told the dealer her grandfather was buying the car for her but was too sick to come in himself.

Defendant paid for the car with a check written on Billy's Senior Checking Account. The check was eventually dishonored by the bank.

On November 30, $8,000 was transferred by telephone from Billy's Cash Maximizer Account to his Senior Checking Account.

On November 30, between 1:00 and 1:30 p.m., defendant walked into a Bank of America branch and attempted to cash a check for $400 written on Billy's Senior Checking Account. However, the signature on the check did not match what was on file for the account and the teller called William C. William told her the check was no good and to call the police. When the teller went to speak with her assistant manager, she saw that defendant had left.

Also on November 30, defendant purchased a 2000 Dodge Stratus from All Star Motors. She had earlier asked for the price of the car out the door and arrived with a check on Billy's Senior Checking Account already filled out. Defendant told the dealer her grandmother was buying the car for her. The check was eventually dishonored.

Sometime in December, Robyn G. purchased a 2000 Dodge Stratus from defendant for $3,000. Later, Robyn heard a report that the car had been stolen and turned it over to the police.

On December 9, Mellony S. purchased a 1992 Honda Civic from defendant for $1,500. However, when Mellony tried to register the vehicle at the Department of Motor Vehicles, she was arrested, because the car had been reported stolen.

At 7:20 p.m. on December 9, defendant entered a Mervyn's store and used Barbara C.'s Mervyn's credit card to purchase merchandise. She signed Barbara C.'s name to the charge receipt.

On December 10, defendant used Barbara C.'s J.C. Penney credit card to purchase $750 in gift certificates.

On December 14, defendant purchased a 1996 Mitsubishi Eclipse from R&R Sales for $9,000. Defendant told the dealer at the time that her

grandfather was buying the car for her and had given her a check. Defendant filled in the name of the payee on the check. The check was later dishonored.

On December 17, defendant passed four checks on Billy C.'s Senior Checking Account at Wal-Mart to purchase merchandise. The checks were written in the amounts of $150.02, $200, $203.59 and $248.98 and contained the forged signature of Barbara C.

On the evening of December 20, Christine B. asked defendant for a ride home, and she and her boyfriend, Mike M., got into a 1996 Mitsubishi with defendant. At approximately 11:45 p.m., Sergeant Steve Solus of the Redding Police Department observed the Mitsubishi travelling on Interstate Highway 5 and, because it had been reported stolen, attempted to effect a traffic stop. However, instead of stopping, the Mitsubishi sped away, committing various traffic offenses along the way. Solus gave chase.

Solus eventually found the Mitsubishi stopped in a trailer park with the driver's side door open and the driver's seat empty. He found Christine B. and Mike M. still inside the car. However, the driver was never located. In the car, officers found a pouch containing check exchange cards, Wal-Mart receipts, check carbons for Billy C.'s Senior Checking Account, identification cards in the name of Christena D., a Mervyn's credit card in the name of Barbara C., a J.C. Penney credit card in the name of Billy C., Discover credit cards in the name of Barbara C., Bank of America access cards in the name of either Billy or Barbara C., and an altered driver's license in the name of Barbara C. They also found two hypodermic needles, a glass device for smoking narcotics, and a clear plastic baggie containing methamphetamine.

Defendant had been the caregiver for Christena D. between January and March 2004.

On December 23, defendant called Palo Cedro Motors asking about a Ford Mustang on the lot. Defendant asked how much it would cost out the door and said she would come by later to purchase it.

Defendant arrived at the dealership with a check made out to Palo Cedro Motors with the notation "Xmas gift." She sat down with a salesman, Gregory V., to fill out a credit application. Defendant appeared to the salesman to be in a hurry, asking why she needed to fill out a credit application when she was paying cash. Gregory told her it was the dealership's policy that buyers take a test drive, but defendant said she did not want to do so. Gregory insisted, and they went out on a test drive.

Meanwhile, Edward C., the owner of the dealership, called the bank to verify the funds were available. He then called the owner of the bank account and the woman who answered told him to call the police, which he did.

When Gregory and defendant returned from the test drive and started to get out of the car, a police car pulled in behind them. Defendant got back in the car and pulled away. As she did so, she poked Gregory in the side with something he took for a gun and ordered him out of the car. Shortly after leaving the lot, Gregory opened the car door and rolled out onto the pavement, injuring himself.

The police chased and eventually found the Mustang, but there was nobody inside. They searched the area for about 10 minutes and found defendant lying in a fetal position under a tree. In a purse defendant had with her, officers found hypodermic needles, a narcotics smoking device, methamphetamine, Vicodin, two blank Bank of America checks with the name Billy C. on them, Honda keys, a Neiman Marcus credit card, and pages of notes with account information on them. They did not find a gun.

Later that night, police officers found a Honda automobile parked one block from Palo Cedro Motors. The keys taken from defendant matched the Honda. Inside the vehicle, the officers found a J.C. Penney gift card in the name of defendant in the amount of $750 with a letter entitling defendant to a gift from Barbara C., a death certificate for Barbara C., multiple check carbons in the name of Barbara C., credit cards and identification for Billy and Barbara C., and note paper with account information and passwords on it.

In late November, defendant had given her sister a key and contract for a storage unit. On December 29, the police opened the storage unit using the key defendant had given her sister. Inside, they found holiday ornaments and decorations belonging to Billy C.

Defendant was charged with the following offenses:

Count 1: Carjacking (§ 215, subd. (a); the Ford Mustang taken from Palo Cedro Motors and Gregory V. on Dec. 23).

Count 2: Unlawful driving or taking a motor vehicle (Veh. Code, § 10851, subd. (a); the Ford Mustang taken from Palo Cedro Motors on Dec. 23).

Count 3: Forgery (§ 470, subd. (d); the check passed to Palo Cedro Motors on Dec. 23).

Count 4: Possession of a forged item (§ 475, subd. (b); a blank Bank of America check with Billy C.'s name on it found on Dec. 23).

Count 5: Possession of a forged item (§ 475, subd. (b); a blank Bank of America check with Billy C.'s name on it found on Dec. 23).

Count 6: Possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a); the methamphetamine found on Dec. 23).

Count 7: Transportation of a controlled substance (Health & Saf. Code, § 11379, subd. (a); the methamphetamine found on Dec. 23).

Count 8: Acquiring or retaining possession of an access card with intent to defraud, a misdemeanor (§ 484e, subd. (c); the Neiman Marcus credit card found on Dec. 23).

Count 9: Unlawful possession of a hypodermic needle, a misdemeanor (Bus. & Prof. Code, § 4140; found on Dec. 23).

Count 10: Unlawful possession of a smoking device (Health & Saf. Code, § 11364; found on Dec. 23).

Count 11: Unlawful driving or taking a motor vehicle (Veh. Code, § 10851, subd. (a); the Mitsubishi driven on Dec. 20).

Count 12: Forgery (§ 470, subd. (d); the check written to R&R Sales on Dec. 20).

Count 13: Evading a pursuing peace officer (Veh. Code, § 2800.2; the chase of the Mitsubishi on Dec. 20).

Count 14: Possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a); the methamphetamine found on Dec. 20).

Count 15: Transportation of a controlled substance (Health & Saf. Code, § 11379, subd. (a); the methamphetamine found on Dec. 20).

Count 16: Unlawful possession of a hypodermic needle, a misdemeanor (Bus. & Prof. Code, § 4140; found on Dec. 20).

Count 17: Receiving stolen property (§ 496, subd. (a); the book of checks found on Dec. 20).

Count 18: Acquiring or retaining possession of an access card with intent to defraud, a misdemeanor (§ 484e, subd. (c); four Bank of America access cards found on Dec. 20).

Count 19: Unlawful use of personal identifying information, a misdemeanor (§ 530.5, subd. (d); Christena D.'s identifying information found on Dec. 20).

Count 20: Unlawful use of personal identifying information, a misdemeanor (§ 530.5, subd. (a); Barbara C.'s identifying information used at Wal-Mart on Dec. 17).

Count 21: Receiving stolen property (§ 496, subd. (a); Barbara C.'s Discover card found on Dec. 20).

Count 22: Unlawful driving or taking a motor vehicle (Veh. Code, § 10851, subd. (a); the 1994 Honda Accord taken from Bailey Motors on Nov. 28).

Count 23: Forgery (§ 470, subd. (d); the check written to Bailey Motors on Nov. 28).

Count 24: Unlawful driving or taking a motor vehicle (Veh. Code, § 10851, subd. (a); the 1992 Honda Civic taken from Attainable Auto on Nov. 29).

Count 25: Forgery (§ 470, subd. (d); the check written to Attainable Auto on Nov. 29).

Count 26: Theft by a caretaker from an elder or dependent adult (§ 368, subd. (e); theft from Billy C. between Aug. 1 and Nov. 30, 2004).

Count 27: Unlawful driving or taking a motor vehicle (Veh. Code, § 10851, subd. (a); the 2000 Dodge Stratus taken from All Star Motors on Nov. 30).

Count 28: Forgery (§ 470, subd. (d); the check written to All Star Motors on Nov. 30).

Count 29: Forgery (§ 470, subd. (d); check No. 5268 written to defendant for $400 on Nov. 30).

Count 30: Forgery (§ 470, subd. (d); check No. 5251 written to defendant for $200 on Nov. 12).

Count 31: Forgery (§ 470, subd. (d); check No. 5252 written to defendant for $200 on Nov. 13).

Count 32: Forgery (§ 470, subd. (d); check No. 5254 written to defendant for $200 on Nov. 15).

Count 33: Forgery (§ 470, subd. (d); check No. 5263 written to defendant for $170 on Nov. 22).

Count 34: Forgery (§ 470, subd. (d); check No. 5264 written to defendant for $170 on Nov. 22).

Count 35: Receiving stolen property (§ 496, subd. (a); the holiday ornaments).

Count 36: Forgery (§ 470, subd. (d); check No. 5260 written to defendant for $170 on Nov. 23).

Count 37: Forgery (§ 470, subd. (d); check No. 416 for $180 cashed at Bank of America on Nov. 23).

Count 38: Forgery (§ 470, subd. (d); check No. 420 for $200 cashed at Bank of America on Nov. 26).

Count 39: Forgery (§ 470, subd. (d); check No. 421 for $180 cashed at Bank of America on Nov. 26).

Count 40: Forgery (§ 470, subd. (d); check No. 423 for $180 cashed at Bank of America on Nov. 27).

Count 41: Forgery (§ 470, subd. (d); check No. 5261 for $180 cashed on Nov. 29).

Count 42: Forgery (§ 470, subd. (d); check No. 5273 for $150.02 passed to Wal-Mart on Dec. 17).

Count 43: Forgery (§ 470, subd. (d); check No. 5274 for $200 passed to Wal-Mart on Dec. 17).

Count 44: Forgery (§ 470, subd. (d); check No. 5275 for $203.59 passed to Wal-Mart on Dec. 17).

Count 45: Forgery (§ 470, subd. (d); check No. 5279 for $248.98 passed to Wal-Mart on Dec. 17).

Count 46: Receiving stolen property (§ 496, subd. (a); the Mervyn's credit card of Barbara C. used on Dec. 9).

Count 47: Unlawful use of personal identifying information, a misdemeanor (§ 530.5, subd. (a); Barbara C.'s identifying information used at Mervyn's on Dec. 9).

Count 48: Second degree burglary (§ 459; entering Mervyn's on Dec. 9 with intent to steal).

Count 49: Forgery (§ 470, subd. (d); signing Barbara C.'s name to the Mervyn's charge receipt on Dec. 9).

Count 50: Signing another's name to an access card or sales slip, a misdemeanor (§ 484f, subd. (b); signing the Mervyn's receipt on Dec. 9).

Count 51: Fraudulent use of an access card (§ 484g; purchase of the gift card from J.C. Penney on Dec. 10).

Defendant was convicted on all counts and, as mentioned above, was sentenced to an aggregate, unstayed term in state prison of 24 years.

DISCUSSION

I, II[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

III

*Counts 20 and 47*

On counts 20 and 47, defendant was convicted of unlawful use or transfer of personal identifying information within the meaning of section 530.5, subdivision (a). That subdivision reads: "Every person who willfully obtains personal identifying information . . . of another person, and uses that information for any unlawful purpose, including to obtain, or attempt to obtain, credit, goods, services, real property, or medical information without the consent of that person, is guilty of a public offense . . . ."

In count 20, defendant was charged with violating section 530.5, subdivision (a), on or about December 20, 2004. In count 47, she was charged with violating that provision on or about December 9, 2004. In her arguments to the jury, the prosecutor explained count 20 relates to defendant's use of Barbara C.'s driver's license at Wal-Mart on December 17, while count 47 concerns defendant's use of the driver's license at Mervyn's on December 9.

Defendant contends her conviction on count 47 must be reversed, because there was only one unlawful taking of personal identifying information.

[*]See footnote, *ante,* page 442.

According to defendant, "[s]ince there was only a single acquisition of the drivers licenses, and her use thereof was motivated by a single plan to use Barbara's identification when passing stolen checks and credit cards to obtain merchandise, [defendant] only committed a single violation of section 530.5, subdivision (a)."

We disagree. In order to violate section 530.5, subdivision (a), a defendant must both (1) obtain personal identifying information, and (2) use that information for an unlawful purpose. (*People v. Tillotson* (2007) 157 Cal.App.4th 517, 533 [69 Cal.Rptr.3d 42].) Thus, it is the use of the identifying information for an unlawful purpose that completes the crime and each separate use constitutes a new crime.

Defendant cites two cases, *People v. Bailey* (1961) 55 Cal.2d 514 [11 Cal.Rptr. 543, 360 P.2d 39] (*Bailey*) and *People v. Robertson* (1959) 167 Cal.App.2d 571 [334 P.2d 938] (*Robertson*), for the proposition that where multiple takings are motivated by a single intention and plan, they constitute a single crime. In *Bailey*, the defendant was charged with a single count of grand theft in connection with her fraudulent receipt of multiple welfare payments which, singularly, were below the threshold for grand theft but, in the aggregate, were sufficient. (*Bailey*, at pp. 515–516.) The court concluded it was proper to consider the multiple welfare payments as one offense where they were motivated by a single intent and plan. (*Id.* at p. 519.)

In *Robertson*, the defendant was convicted of three counts of grand theft and one count of petit theft stemming from his conduct in obtaining charge accounts at four stores and making multiple purchases on those charge accounts. (*Robertson, supra*, 167 Cal.App.2d at pp. 573–574, 576.) The court concluded it was proper to aggregate the purchases at each store to determine if the offense was grand or petit theft. According to the court: " '[T]he general test as to whether there are separate offenses or one offense is whether the evidence discloses one general intent or discloses separate and distinct intents. The particular facts . . . of each case determine the question. If there is but one intention, one general impulse, and one plan, even though there is a series of transactions, there is but one offense, and this is so whether the theft is accomplished by larceny or embezzlement.' " (*Id.* at p. 577, quoting *People v. Howes* (1950) 99 Cal.App.2d 808, 818–819 [222 P.2d 969].)

The foregoing cases are distinguishable. The question in each was whether a defendant will be permitted to avoid a charge of grand theft by breaking up his transactions into a series of petit thefts. A defendant might go into a store and buy a large amount of merchandise on a single occasion or spread those purchases out over several days. However, the end result to the merchant is

the same. In *Bailey*, the court explained: "Whether a series of wrongful acts constitutes a single offense or multiple offenses depends upon the facts of each case, and a defendant may be properly convicted upon separate counts charging grand theft from the same person if the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan." (*Bailey, supra*, 55 Cal.2d at p. 519.)

In deciding whether a defendant commits a series of thefts pursuant to a single intent or plan, we do not use a single, broad objective of stealing property. A defendant who steals from multiple victims over a lengthy crime spree may have a single objective of obtaining as much money or property as possible. However, he has still committed multiple offenses. (See *People v. Ashley* (1954) 42 Cal.2d 246, 273 [267 P.2d 271]; *People v. Rabe* (1927) 202 Cal. 409, 413 [261 P. 303]; *People v. Barber* (1959) 166 Cal.App.2d 735, 741–742 [333 P.2d 777]; *People v. Caldwell* (1942) 55 Cal.App.2d 238, 251 [130 P.2d 495]; *People v. Ellison* (1938) 26 Cal.App.2d 496, 498–499 [79 P.2d 732].) As the California Supreme Court explained in *Rabe*, "[w]here the proof in a given case is sufficient to show the existence of a fraudulent intent or purpose on the part of an accused to obtain property from another by false or fraudulent representations, the making of the first false representations which moved or induced the person to whom they were made to part with his property does not immune the defrauding person from punishment for subsequently obtaining from said person other property which was parted with under the influence of the fraudulent representations which were still operating upon the mind of the defrauded person at the time he passed his property into the hands of said designing person." (*People v. Rabe, supra*, 202 Cal. at p. 413.)

By parity of reasoning, a single theft of personal identifying information and use of that information to obtain property will not immunize the thief from prosecution for subsequent uses of the information to obtain other property.

In *People v. Neder* (1971) 16 Cal.App.3d 846 [94 Cal.Rptr. 364] (*Neder*), the defendants used another's credit card to make three separate purchases from the same store. On each purchase, one of the defendants signed a sales slip for the purchase. They were convicted of three counts of forgery. (*Id.* at pp. 849–850.) On appeal, the appellant argued there was only one offense committed within the meaning of *Bailey*, because there was a single intent and plan associated with the three forgeries. The Court of Appeal disagreed, explaining: "In the instant case it is probably true that the forgeries were motivated by a preconceived plan to obtain merchandise from Sears by use of [the victim's] credit card and by forging sales slips. However, we do not feel

that the *Bailey* doctrine should be extended to forgery. That doctrine was developed for the crime of theft to allow, where there is a common plan, the accumulation of receipts from takings, each less than $200, so that the taker may be prosecuted for grand theft as opposed to several petty thefts. The essential act in all types of theft is taking. If a certain amount of money or property has been taken pursuant to one plan, it is most reasonable to consider the whole plan rather than to differentiate each component part. [Citation.] The real essence of the crime of forgery, however, is not concerned with the end, i.e., what is obtained or taken by the forgery; it has to do with the means, i.e., the act of signing the name of another with intent to defraud and without authority, or of falsely making a document, or of uttering the document with intent to defraud. Theft pursuant to a plan can be viewed as a large total taking accomplished by smaller takings. It is difficult to apply an analogous concept to forgery. The designation of a series of forgeries as one forgery would be a confusing fiction." (*Id.* at pp. 852–853, fn. omitted.)

■ Section 530.5, subdivision (a), is committed each time an offender *uses* personal identifying information for any unlawful purpose. Contrary to defendant's argument, the first such fraudulent use did not immunize her from punishment for subsequent fraudulent uses. Defendant was therefore properly convicted on both counts 20 and 47.

IV

*Counts 49 and 50*

Defendant contends she could not be convicted on both counts 49 and 50, because they are both premised on the same act of forging Barbara C.'s signature to the Mervyn's charge receipt. Therefore, defendant argues, her conviction on count 50 must be reversed. The People concede error.

On count 49, defendant was convicted of forgery under section 470, subdivision (d), which reads: "Every person who, with the intent to defraud, falsely makes, alters, forges, or counterfeits, utters, publishes, passes or attempts or offers to pass, as true and genuine, any of the following items, knowing the same to be false, altered, forged, or counterfeited, is guilty of forgery: . . . receipt for money or property . . . ." In her argument to the jury, the prosecutor explained that count 49 is based on defendant's signing Barbara C.'s name to the Mervyn's charge receipt.

On count 50, defendant was convicted of misdemeanor forgery of an access card transaction within the meaning of section 484f, subdivision (b). That subdivision reads: "A person other than the cardholder or a person authorized by him or her who, with intent to defraud, signs the name of

another or of a fictitious person to an access card, sales slip, sales draft, or instrument for the payment of money which evidences an access card transaction, is guilty of forgery." The prosecutor argued count 50 is based on defendant's fraudulent use of Barbara C.'s Mervyn's credit card. However, inasmuch as section 484f, subdivision (b), prohibits the act of signing the name of another with intent to defraud, this count is necessarily based on defendant's signing Barbara C.'s name to the Mervyn's charge receipt as well.

In support of her argument that she could not be convicted on both counts 49 and 50, defendant relies on *People v. Ryan* (2006) 138 Cal.App.4th 360 [41 Cal.Rptr.3d 277] (*Ryan*). In *Ryan*, the defendant forged a signature on a check and then passed the forged check in order to obtain merchandise. She was convicted under section 470, subdivision (a), for forging the signature and under section 470, subdivision (d), for passing the forged check. (138 Cal.App.4th at pp. 362–363.) The Court of Appeal concluded she could not be convicted on both counts, because subdivisions (a) and (d) of section 470 are alternate ways of describing the same offense of forgery. The court pointed out that, as originally enacted, section 470 did not have subdivisions, and courts had consistently held there is one crime of forgery and the various acts proscribed by the statute are simply different means of committing the offense. (138 Cal.App.4th at pp. 364, 366.) According to the court, "[t]he overhaul of section 470 and related provisions was intended to ' "make [the] laws governing financial crimes more 'user friendly' " ' and ' "to clarify and streamline existing law with regard to forgery and credit card fraud." ' It was not intended to 'change the meaning or legal significance of the law,' but ' "merely [to] organize[] the relevant code sections into a cohesive and succinct set of laws that can be readily referred to and understood." ' " (*Id.* at p. 366.)

Defendant recognizes that counts 49 and 50 alleged violations of different statutes rather than different subdivisions of the same statute. Nevertheless, she argues the two statutes are just alternate ways of committing the single crime of forgery.

We disagree. In *Ryan*, the court made a point of distinguishing cases where the defendant was accused of violating different statutes. (*Ryan, supra,* 138 Cal.App.4th at pp. 368–369.) The court explained: "While each statute may represent a different statement of the same offense, it sets out a separate crime, not just—as in the case of section 470—alternative ways in which the *same crime* can be committed. In the case before us, although appellant arguably committed separate acts—signing the checks and then uttering them—she did not, thereby, violate more than one statute, but simply committed acts contained in separate subdivisions of a single statute, all of which were simply different ways of violating that statute." (*Id.* at p. 369.)

In conceding error in this instance, the People rely primarily on *Neder*. As described above, the defendant in *Neder* was charged with three counts of forgery under section 470 stemming from three credit card purchases. (*Neder, supra*, 16 Cal.App.3d at pp. 849–850.) The defendant argued he could not be prosecuted under the general forgery statute (§ 470) but instead must be prosecuted under the more specific statute for credit card forgeries (§ 484f), relying on a line of cases holding that, where a general statute and a specific statute cover the same criminal conduct, the defendant can be convicted only of the specific statute. (See *People v. Ruster* (1976) 16 Cal.3d 690, 698–699 [129 Cal.Rptr. 153, 548 P.2d 353], disapproved on other grounds in *People v. Jenkins* (1980) 28 Cal.3d 494, 503, fn. 9 [170 Cal.Rptr. 1, 620 P.2d 587] [unemployment insurance fraud must be prosecuted under Unemp. Ins. Code, § 2102 rather than Pen. Code, § 470]; *People v. Gilbert* (1969) 1 Cal.3d 475, 479–481 [82 Cal.Rptr. 724, 462 P.2d 580] [welfare fraud must be prosecuted under Welf. & Inst. Code, § 11482 rather than the general theft statute, Pen. Code, § 484]; *In re Williamson* (1954) 43 Cal.2d 651, 654 [276 P.2d 593] [" 'It is the general rule that where the general statute standing alone would include the same matter as the special act, and thus conflict with it, the special act will be considered as an exception to the general statute whether it was passed before or after such general enactment' "]; *People v. Swann* (1963) 213 Cal.App.2d 447, 449 [28 Cal.Rptr. 830] [credit card fraud must be prosecuted under Pen. Code, former § 484a rather than the more general forgery statute, Pen. Code, § 470].)

In *Neder*, the court found the foregoing line of cases inapplicable. Those cases were premised on a determination that, where the Legislature enacts a special statute covering the same conduct as a general statute, it must have intended to create an exception to application of the general statute. (See *People v. Jenkins, supra*, 28 Cal.3d at pp. 505–506; *People v. Ruster, supra*, 16 Cal.3d at p. 699.) However, in *People v. Liberto* (1969) 274 Cal.App.2d 460 [79 Cal.Rptr. 306], the court pointed out that 1967 amendments to the special credit card forgery statute (former § 484a) demonstrated a legislative intent that prosecution under the general forgery statute (§ 470) is no longer precluded. (See Stats. 1967, ch. 1395, § 8, p. 3260.)

Relying on *Liberto*, the *Neder* court concluded the defendant was properly prosecuted under section 470, rather than section 484f. (*Neder, supra*, 16 Cal.App.3d at p. 855.) The court explained: "We agree with *Liberto* that the 1967 enactment, which repealed section 484a, added section 484f, and provided '[t]his act shall not be construed to preclude the applicability of any other provision of the criminal law,' expressed a legislative intent to overcome the judicial interpretation theretofore placed on credit card prosecutions to the effect that a person charged with an offense involving a credit card could not be prosecuted under the general statutes if the People so chose." (*Neder, supra*, 16 Cal.App.3d at p. 855, fn. omitted.)

The People read *Neder* to mean a defendant guilty of credit card forgery can be prosecuted *only* under section 470. However, that is not what the court held. The question presented in *Neder* was whether the defendant was properly convicted under section 470, and the Court of Appeal answered that question in the affirmative. However, because the defendant was not also prosecuted under section 484f, there was no occasion to determine whether he could be prosecuted under both provisions.

An accusatory pleading may charge different statements of the same offense. (§ 954.) As a general rule, "a person may be *convicted* of, although not *punished* for, more than one crime arising out of the same act or course of conduct. 'In California, a single act or course of conduct by a defendant can lead to convictions "of *any number* of the offenses charged." [Citations.]' [Citation.]" (*People v. Reed* (2006) 38 Cal.4th 1224, 1226–1227 [45 Cal.Rptr.3d 353, 137 P.3d 184] (*Reed*).)

"A judicially created exception to the general rule permitting multiple conviction 'prohibits multiple convictions based on necessarily included offenses.' [Citation.] '[I]f a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former.' [Citation.]" (*Reed, supra*, 38 Cal.4th at p. 1227.)

Two tests have traditionally been applied to determine whether one offense is necessarily included within another: the "elements" test and the "accusatory pleading" test. "Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former. Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former." (*Reed, supra*, 38 Cal.4th at pp. 1227–1228.)

In *Reed, supra*, 38 Cal.4th at page 1229, the California Supreme Court concluded only the elements test may be applied in determining whether multiple convictions are permitted.

Thus, the question in the present matter is whether section 484f, subdivision (b), the lesser misdemeanor offense charged in count 50, is a necessarily included offense of section 470, subdivision (d). If so, then defendant could not be convicted of both based on the same act.

As described above, section 484f, subdivision (b), is violated where a person, without authorization, "signs the name of another or of a fictitious person to an access card, sales slip, sales draft, or instrument for the payment of money which evidences an access card transaction." (§ 484f, subd. (b).)

The actus reus of this offense is *signing* the name of another. By contrast, section 470, subdivision (d), can be violated where a person "falsely makes, alters, forges, or counterfeits, utters, publishes, passes or attempts or offers to pass, as true and genuine" any of a number of items, including a "receipt for money or property." (§ 470, subd. (d).) It is readily apparent that section 470, subdivision (d), can be violated without also violating section 484f, subdivision (b). Section 470, subdivision (d), may be violated by forging a signature on one of the indicated documents. However, it may also be violated by uttering, publishing or passing the item, whether or not the person also forged a signature on it. In the latter case, there is no violation of section 484f, subdivision (b).

■ Of course, in the present matter, the People argued both offenses were committed by virtue of the same act, signing Barbara C.'s name to the charge slip. However, as the state Supreme Court determined in *Reed, supra*, 38 Cal.4th at page 1229, we cannot look beyond the statutory elements of the offenses to determine if one is a necessarily included offense of the other. In this case, under the elements test, section 484f, subdivision (b), is not a necessarily included offense of section 470, subdivision (d). Therefore, defendant was properly convicted on both counts 49 and 50.

V, VI*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

VII

*Multiple Receiving Stolen Property Counts*

Defendant contends her conviction on three of the four receiving stolen property counts mentioned in the nonpublished portion of the opinion must be reversed, because the prosecution failed to prove the property subject to those counts was received on different occasions. As noted above, in count 17, defendant was charged with receiving checks belonging to Billy C. on or about December 20, 2004; in count 21, she was charged with receiving Barbara C.'s Discover card on or about December 20, 2004; in count 35, she was charged with receiving holiday ornaments and decorations belonging to Billy C. on and between November 28, 2004, and December 29, 2004; and in count 46, she was charged with receiving Barbara C.'s Mervyn's credit card on or about December 9, 2004.

■ Where a defendant receives multiple articles of stolen property at the same time, this amounts to but one offense of receiving stolen property.

---

*See footnote, *ante*, page 442.

(*People v. Lyons* (1958) 50 Cal.2d 245, 275 [324 P.2d 556]; *People v. Smith* (1945) 26 Cal.2d 854, 858–859 [161 P.2d 941]; *People v. Willard* (1891) 92 Cal. 482, 488 [28 P. 585].) As the California Supreme Court explained in *Smith*, this circumstance is comparable to the crime of larceny, "which authorities hold that the theft of several articles at one and the same time constitutes but one offense although such articles belong to several different owners." (*People v. Smith, supra*, 26 Cal.2d at p. 859.)

The People concede that counts 17 and 21 are duplicative, as they concern checks and a credit card that were found in the Mitsubishi on December 20, 2004, and, hence, were possessed by defendant at the same time. However, the People argue conviction on the other counts was proper, because they were committed on different occasions.

Penal Code section 496, subdivision (a), reads in pertinent part: "Every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished by imprisonment in a state prison, or in a county jail for not more than one year. . . ."

Despite its common moniker of receiving stolen property, this offense may be committed in a number of ways, to wit, buying, receiving, concealing, selling, withholding, or aiding in concealing, selling, or withholding stolen property.

The People contend counts 17 and 21 are duplicative because the property subject to those counts was "possessed" by defendant at the same time. However, mere possession is not one of the means by which this offense can be committed. Of course, *possession* may be viewed as another way of saying the property was *withheld* or *concealed* from its rightful owner. Nevertheless, the mere fact the checks and credit card were withheld or concealed from the rightful owner by defendant at the same time, i.e., the day they were found in the Mitsubishi, does not preclude conviction for multiple counts of receiving stolen property. If the evidence showed those items had been received by defendant on different occasions, presumably multiple convictions would be permitted.

It is often the case with theft-related offenses that the People do not have direct evidence of the theft of the victims' property. Although circumstantial evidence of a defendant's opportunity to steal the items and later possession of them would suggest he was the thief, it is a safer bet to prosecute for receiving stolen property.

That appears to be the case here. Circumstantial evidence of defendant's opportunity to steal property while working for Billy C. coupled with her later possession of that property suggests she was the thief. Nevertheless, it is conceivable someone else stole the property and passed it on to defendant. Therefore, with uncontradicted evidence of defendant's possession of the property under circumstances suggesting it had been stolen by someone, the People may have considered prosecution for receiving stolen property the more prudent course.

As with the lack of direct evidence that defendant stole the property, there is nothing in the record to suggest the People had any evidence as to when defendant came into possession of it. Counts 17 and 21 alleged receipt of stolen property on or about December 20, 2004. This was the day the property was discovered by the police. However, presumably it was received by defendant some time earlier. On the other hand, December 20 would be a day on which defendant withheld or concealed the property from its rightful owner. Count 46 alleged receipt of the Mervyn's credit card on or about December 9, 2004, the day it was used by defendant to purchase merchandise. Count 35 alleged receipt of the holiday ornaments on and between November 28, 2004, and December 29, 2004. Evidence presented at trial established that defendant gave her sister a key to a storage unit toward the end of November 2004 and the holiday ornaments were found in the unit on December 29, 2004.

Defendant was charged in counts 17, 21, 35, and 46 in the alternative with buying, receiving, concealing, selling, withholding, or aiding in concealing or withholding property. No evidence was presented as to defendant's buying, receiving, or selling any of the property. Thus, on each count, defendant's guilt turned on when she concealed or withheld the property from its owner. In her argument to the jury, the prosecutor explained these counts were based on defendant's possession of the property, i.e., her concealing or withholding the property, on the indicated days.

As with counts 8 and 18 discussed above, the People were required to prove defendant concealed or withheld the property subject to counts 17, 21, 35, and 46 at the time alleged. They satisfied that burden. They were not required to prove when defendant received the property, as that was not their theory of liability. Because the evidence showed defendant possessed both the checks of Billy C. (count 17) and the Discover card of Barbara C. (count 21) on or about December 20, 2004, she could not be convicted on both offenses. (*People v. Smith, supra,* 26 Cal.2d at pp. 858–859; *People v. Lyons, supra,* 50 Cal.2d at p. 275; *People v. Willard, supra,* 92 Cal. at p. 488.) Her conviction on count 21 must therefore be reversed.

## VIII

### *Unanimity Language of Various Instructions*

In connection with counts 17, 21, 35 and 46, the jury was instructed on the offense of receiving stolen property pursuant to a modified version of CALCRIM No. 1750 as follows:

"The defendant is charged in Counts 17, 21, 35, 46 with receiving stolen property.

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant received, concealed, or withheld from its owner property that had been stolen;

"AND

"2. When the defendant received, concealed or withheld the property, she knew that the property had been stolen.

"Property is stolen if it was obtained by any type of theft, or by burglary.

"To receive property means to take possession and control of it.

"Mere presence near or access to the property is not enough.

"Two or more people can possess the property at the same time. A person does not have to actually hold or touch something to possess it. It is enough if the person has control over it or the right to control it, either personally or through another person.

"*You may not find the defendant guilty unless you all agree that the People have proved the defendant received, concealed or withheld from its owner at least one item of property that had been stolen and you all agree on which item of property had been received, concealed or withheld.*" (Italics added.)

Defendant contends the final paragraph of the instruction was inadequate as a unanimity requirement, because "it allowed the jury to convict [her] of all four counts of receiving stolen property even if the jury only unanimously agreed that [she] had received, concealed or withheld from its owner one, rather than four, items of stolen property."

Defendant failed to object to the instruction. As explained in the nonpublished portion of the opinion, failure to object to instructional error forfeits the objection on appeal unless the defendant's substantial rights are affected. (§ 1259; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1192–1193 [36 Cal.Rptr.2d 235, 885 P.2d 1].) "Substantial rights" are equated with errors resulting in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]. (*People v. Arredondo* (1975) 52 Cal.App.3d 973, 978 [125 Cal.Rptr. 419].)

The forfeiture rule applies to claims based on statutory violations, as well as claimed violations of fundamental constitutional rights. (*In re Seaton* (2004) 34 Cal.4th 193, 198 [17 Cal.Rptr.3d 633, 95 P.3d 896].) "The reasons for the rule are these: ' "In the hurry of the trial many things may be, and are, overlooked which would readily have been rectified had attention been called to them. The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal." ' " (*Ibid.*) "To consider on appeal a defendant's claims of error that were not objected to at trial 'would deprive the People of the opportunity to cure the defect at trial and would "permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal." ' " (*Ibid.*)

Defendant contends the last paragraph of the instruction should have been modified to read: "You may not find the defendant guilty of count 17, 21, 35, and/or 46 unless you all agree as to each such count that the People have proved that the defendant received, concealed or withheld from its owner at least one item of property that had been stolen, and you all agree on which item of property has been received, concealed or withheld as to each count." However, if defendant had brought this to the court's attention, it would have been a simple matter to make the requested modifications if warranted. However, defendant deprived the prosecution and the court of an opportunity to do so.

In our view, defendant's substantial rights were not affected by the instruction as given. The jury was instructed with CALCRIM No. 3515 that each count is a separate crime and must be considered separately. In the instruction on receiving stolen property, the jury was told defendant was charged with four counts of receiving stolen property and the instruction proceeded to define the requirements for conviction on one such offense. The language of the final paragraph continued this format. It did not direct the jury to convict on all four counts if the elements for one count are satisfied. Because defendant's substantial rights were not affected, her failure to object forfeited any claim of error.

Defendant raises an identical claim of error as to the instructions given on the offenses of forgery under section 470, subdivision (d), unlawfully acquiring or retaining an access card in violation of section 484e, subdivision (c), and unlawful possession of a hypodermic needle or syringe in violation of Business and Professions Code section 4140. However, as to each instruction, defendant failed to object, and her substantial rights were not adversely affected thereby. Therefore, for the same reasons stated above, her claim of error is forfeited.

## IX

### *Ineffective Assistance*

Defendant contends her counsel's failure to object to the unanimity language in the instructions discussed in the preceding part amounted to ineffective assistance. According to defendant, "[i]f this court agrees with the merits of [defendant's] arguments [in the preceding part], but concludes the issues are waived based on lack of specific objections, then a further conclusion of ineffective assistance of counsel must inexorably follow."

Actually, the only thing that inexorably follows a finding that an argument on appeal has been forfeited by counsel's failure to object is a claim of ineffective assistance. This has increasingly become the favored means by which appellate defense counsels attempt to avoid any and all claims of forfeiture. In effect, if an issue was forfeited, then trial counsel's representation must have been deficient, and the issue must be considered anyway to determine if the ineffective assistance resulted in prejudice. However, that is not the applicable standard.

Under both the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution, a criminal defendant has a right to the assistance of counsel. (See *Strickland v. Washington* (1984) 466 U.S. 668, 684–685 [80 L.Ed.2d 674, 691–692, 104 S.Ct. 2052]; *People v. Pope* (1979) 23 Cal.3d 412, 422 [152 Cal.Rptr. 732, 590 P.2d 859].) This right "entitles the defendant not to some bare assistance but rather to *effective* assistance." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839].) " '[I]n order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he must also show

prejudice flowing from counsel's performance or lack thereof.' " (*In re Avena* (1996) 12 Cal.4th 694, 721 [49 Cal.Rptr.2d 413, 909 P.2d 1017].)

"[T]he mere failure to object rarely rises to a level implicating one's constitutional right to effective legal counsel." (*People v. Boyette* (2002) 29 Cal.4th 381, 433 [127 Cal.Rptr.2d 544, 58 P.3d 391].) If, as here, the record fails to show why counsel failed to object, the claim of ineffective assistance must be rejected on appeal unless counsel was asked for an explanation and failed to provide one or there can be no satisfactory explanation. (*People v. Huggins* (2006) 38 Cal.4th 175, 206 [41 Cal.Rptr.3d 593, 131 P.3d 995].) "A reviewing court will not second-guess trial counsel's reasonable tactical decisions." (*People v. Kelly* (1992) 1 Cal.4th 495, 520 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

In the present matter, after setting forth the basic standard for ineffective assistance, defendant's argument consists of the following: "Since there is a reasonable probability that verdicts more favorable to [defendant] would have resulted if [defendant]'s counsel had acted in a reasonably competent manner by objecting to the erroneous instructions, this court should consider the instructional arguments raised herein, and reverse [defendant]'s convictions on counts 3, 8, 9, 12, 16, 17, 18, 21, 23, 25, 28–46, 49 and 50. (*In re Sixto* (1989) 48 Cal.3d 1247, 1257 [259 Cal.Rptr. 491, 774 P.2d 164]; *Strickland v. Washington, supra,* 466 U.S. at p. 694.)"

This argument does not even attempt to explain how counsel's failure to object fell below an objective standard of reasonableness or how the failure to object resulted in prejudice. We will not address a claim that defendant has failed to develop. (*People v. Tafoya* (2007) 42 Cal.4th 147, 196, fn. 12 [64 Cal.Rptr.3d 163, 164 P.3d 590]; *People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19 [32 Cal.Rptr.2d 762, 878 P.2d 521].) In this instance, defendant's argument merely presumes counsel's failure to object fell below an objective standard of reasonableness and she was prejudiced thereby. Defendant also neglects to argue how there could be no satisfactory explanation for counsel's failure to object. This will not suffice.

X–XVI\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

\*See footnote, *ante,* page 442.

### Disposition

The judgment is reversed as to counts 5 and 21 and affirmed as to all other counts. The sentences on counts 2, 20, 47 and 50 are stayed pursuant to section 654. The result is an overall reduction of 16 months in defendant's aggregate sentence. The trial court is directed to correct the abstract of judgment to reflect the foregoing and to reflect that defendant was convicted on count 47 of violating section 530.5, subdivision (a), and to reflect the sentence imposed on count 51. The trial court is further directed to forward the corrected abstract to the Department of Corrections and Rehabilitation.

Davis, Acting P. J., and Cantil-Sakauye, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 1, 2008, S165582. Kennard, J., did not participate therein.