Filed 5/23/13  P. v. Delsie CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C071280 |
| Plaintiff and Respondent, | (Super. Ct. No. SF116725A) |
| v. | |
| RUDOLPH DELSIE, | |
| Defendant and Appellant. | |

A jury found defendant Rudolph Delsie guilty of first degree murder, during the commission of which he personally used a deadly weapon.  The trial court then sustained recidivist allegations.  It sentenced him to state prison.

To reorder defendant's arguments on appeal, he contends the trial court erred in denying a motion for mistrial based on stricken testimony about an excluded subject area; there is insufficient evidence of his identity as the killer of the victim; there is insufficient

evidence to support an instruction on aiding and abetting;[1] and the prosecutor committed misconduct in asserting the truth of hearsay evidence. We reject defendant's various claims of error and shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The victim was 42 at the time of his death in October 2009. He received about $700 each month in disability payments, for which he used a debit card to access cash. He lived in a studio apartment in the rear of a converted Victorian on North Commerce Street in Stockton.

Exceedingly concerned with security, the victim kept the entry door locked at all times and did not want to open it for anyone. He also kept two aluminum baseball bats for protection, one by the front door and the other near the bathroom door. One of these was a "Bombat" brand bat, and on the other the victim had written "hello fucker" in pink nail polish. He was a heavy methamphetamine user (the coroner noting he had a "huge amount" in his blood at the time of death). He ran his air conditioner incessantly, even if only on the fan setting.

The victim had been separated from his wife for two years, but visited with her and his children weekly (although the relationship apparently was not without conflict, as defendant had carved a crude epithet directed at her into the wall next to the front door at

---

[1] Interjected under this heading is another claim the prosecutor engaged in misconduct during closing argument (in suggesting an accomplice is "equally guilty" of an offense). This is a "lurking" argument outside the scope of the heading, and consequently forfeits our plenary consideration of it. (*Imagistics Internat., Inc. v. Department of General Services* (2007) 150 Cal.App.4th 581, 593, fn. 10; *Estates of Collins & Flowers* (2012) 205 Cal.App.4th 1238, 1258.) We therefore confine ourselves to the observations that, as we explain more fully in the Discussion, defendant has failed to demonstrate the jury's verdict necessarily rested on a theory of accomplice liability, rendering any prosecution argument about it immaterial. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129 (*Guiton*).)

some point before May 2009).  The victim's wife and the victim's mother both saw him last on October 1.

The victim was a continual sender of text messages who kept his mobile phone constantly at hand.  His last outgoing phone call was in the early morning hours of October 2.  When an upstairs neighbor was in the back yard looking for her cat on the night of October 2, she did not notice anything amiss.[2]

Unable to reach the victim by phone, the victim's wife went to his apartment on the morning of October 3.  The air conditioner was off, and the door was locked.  Her efforts to open the door caught the attention of the upstairs neighbor, who got on top of the garbage bin, climbed through the closed but unlocked window next to the front door, and unlocked the deadbolt.  She did not want to look into the main room from where she stood, and simply walked out the door.  The wife found the victim lying face down next to the bed in a fetal position.  The condition of the body indicated that he had been dead "for quite some time."  The coroner could not specify the time of death, but the cold skin indicated he had been dead for more than six to eight hours.

There was $70 in cash in the victim's front pants pocket, and his wallet (with his debit card) was in the desk.  The apartment had not been ransacked; a television and DVD player, computer equipment, and "medicinal" marijuana were still there.  The victim's wife did not notice anything missing other than the victim's cell phone and keys.

The victim had been struck in the head at least three times, at first on the bed (where he had lain for a period of time, because there was a large pool of blood) and then on the floor.  The blows were on the front, middle, and back of his head (the latter

---

[2]  The neighbor had known the victim for about a year and been living in the building for months; while his wife was present the previous week, the victim had complained to the neighbor about her placement of trash in the garbage bins.

appearing to have been the hardest blow, which would have caused immediate unconsciousness and was the cause of death) and were consistent with a blunt object such as a baseball bat. There was bruising on his back from four other blows of lesser force. There was also a gaping slash wound on the right side of his neck. The skin on the knuckle of his right thumb was shaved off, indicating it was a defensive wound from a knife attack. The coroner could not determine the order in which the various injuries were inflicted.

A criminalist found latent prints on the deadbolt plate, but they did not match either the victim or defendant. He could not retrieve any latent prints from the baseball bats. After examining the rest of the apartment, the criminalist identified only one palm print as the victim's, and did not otherwise match prints to any subject.

The Bombat bat had dents and white paint transfers on it. The walls in the apartment were white, and there were dents in a door frame.

A DNA criminalist from the Ripon crime lab took swabs from the handle of the Bombat bat and a stain on the handle that tested presumptively for blood (samples 1A and 1B). From the other bat, she took swabs of the handle (sample 2A) and from a bloodstain on the end of the bat (sample 2D).[3]

Sample 1A had a mixture of DNA from three contributors: the victim and two minor contributors, neither of whom could have been defendant.[4] The bloodstain in sample 2D matched a sample of the victim's DNA. There was a mixture of DNA from

---

[3] Samples 2B and 2C were from other red stains on the barrel end of the second bat. The parties do not indicate there is any testimony regarding these samples or sample 1B.

[4] Initially, the criminalist had compared the non-victim DNA on the handles of the two bats with a computer database. Sample 1A did not find any potential matches. Sample 2A identified a potential match with defendant, from whom police obtained a DNA sample for further comparison.

4

two contributors in sample 2A from the bat's handle. The victim was the major contributor, and the minor contributor was a partial match with a sample from defendant's DNA, which the criminalist described as "strong evidence" that defendant was the source. There was also a very low level of short fragmented DNA foreign to both the victim and defendant, which she assumed was an artifact of the replication process and was not from another contributor, and therefore she did not account for it in her calculations. The criminalist's supervisor and the assistant lab director agreed with her conclusions.

A criminalist who worked at a different crime lab with a kit five times more sensitive—designed to catch degraded or broken DNA (although it focuses on only half of the locations of the kit used at the Ripon lab)—believed there was DNA in sample 2A from three contributors. The mix of DNA and the low levels involved made it too complex to compare it meaningfully with defendant's DNA.

A forensic scientist from a third lab, also using the more sensitive kit, tested sample 2A and new swabs from various locations on the same bat (combined into a single sample). He believed there were a minimum of three contributors in the samples. These included the victim as a major donor and DNA consistent with defendant, as well as DNA indicators that did not match either one of them. His lab thus could not conclude with 100 percent certainty that the samples matched defendant. He believed defendant could be excluded as a donor in the new sample, but not in sample 2A.

In rebuttal, the original criminalist and the assistant director (Ripon lab) testified that their opinions regarding sample 2A were not changed after hearing the defense experts. The criminalist believed many people could have touched the bat over time, and the more sensitive kit would pick up all this background DNA that she disregarded. She further explained there was a fundamental difference of opinion in procedure between the approach of the defense experts and her lab's approach, which considered it proper to

5

subtract the DNA of the victim from the results because it was a given that it would be present on the victim's property.

When a detective interviewed defendant in November 2010 in connection with obtaining a DNA sample, defendant told him he had been living in a ditch near Interstate 5 in October 2009 and using a bicycle for transportation. He claimed not to recognize anyone (except possibly a woman) in a group of pictures that included the victim. Asked if he had ever been in the area of North Commerce Street, defendant said he had lived there for a couple of months with his sister in 2005 or 2006. Defendant said a picture of the victim's house looked familiar, probably because he would pass by it when he lived in that area. When directed to the picture of the victim, defendant denied knowing him or ever being in a fight with him. The detective asked if defendant would change his story if his fingerprints connected him with the victim's apartment; defendant replied, "We'll see." In an interview after his January 2011 arrest, police told defendant they had found his DNA on a bat that killed the victim. Defendant said they should "double check" their results. He refused to look at pictures of the victim from the crime scene.

A witness who had been dating defendant's sister related a conversation between the siblings that took place while he was in the sister's apartment, probably in 2006. The sister told defendant not to do something because the victim was a good guy. (The boyfriend was familiar with the victim, who lived near a friend of his.) The boyfriend eventually testified, somewhat reluctantly,[5] that he had told a police detective[6] in an interview that defendant had expressed his anger at the victim to his sister for cheating him, and the sister wanted to deter defendant from retaliating against the victim.

---

[5] As early as the preliminary hearing, the boyfriend had declared his reluctance to testify.

[6] The police detective confirmed this account.

## DISCUSSION

### I.  Mistrial Motion

Before trial, the prosecutor sought to introduce a warning defendant had given to the boyfriend to the effect that if the boyfriend made his sister cry, defendant was not afraid to take a life because he had done so before.  The trial court tentatively ruled it inadmissible as irrelevant character evidence and unduly prejudicial even if relevant, but there would need to be a foundational hearing in any event before it could make a final ruling.

Before the boyfriend testified at trial, the prosecutor expressly conceded the issue and asserted that he would not question the boyfriend about it.  In the course of attempting to get the boyfriend to confirm his statement to the detective, the boyfriend responded (apropos of nothing), "He—I talked about it to [the detective] just a little bit ago, but there's some stuff on there I don't remember saying, he said I said, but when I said it, I think I was a little bit like mad at [defendant] for trying to intimidate me and, you know, things come out like when you say, 'I'm going to kill you,' that don't mean they are going to kill you.  That means they are going to beat your ass or punch you down, beat you up or whatever."  The court struck the testimony as nonresponsive. Defense counsel requested a recess, at which he moved for a mistrial.

The prosecutor pointed out that the testimony was entirely unanticipated; in a haste to get the previously unavailable witness on the stand it had not occurred to him to specifically advise the boyfriend against mentioning the threat.  The trial court stated, "I don't think this rises to the level of a mistrial.  Jury was told to disregard the statement." The court admonished the witness to avoid this subject.  Defense counsel did not request any further admonition to the jury about the stricken testimony.

On appeal, defendant asserts the trial court abused its discretion because this snippet of excluded testimony was incurably prejudicial and thus the admonition to

7

disregard it was ineffective. He contends the error amounted to a deprivation of due process that was not harmless beyond a reasonable doubt.

A trial court should grant a motion for mistrial only where an admonition or instruction cannot cure any prejudice. The court's ruling is reviewed for an abuse of discretion. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 291-292 (*Gonzales*).)

The effectiveness of admonitions and instructions generally is a pragmatic presumption essential to the system of trial by jury, without which we court judicial anarchy because there would not be any point either in instructing a jury or reversing for improper instructions. The presumption is overcome only in *extraordinary* situations where it would fly in the face of human nature, such as where an involuntary confession or the inculpatory extrajudicial statements of a codefendant are involved. (*Richardson v. Marsh* (1987) 481 U.S. 200, 211 [95 L.Ed.2d 176, 188]; *Francis v. Franklin* (1985) 471 U.S. 307, 324, fn. 9 [85 L.Ed.2d 344, 359]; *Parker v. Randolph* (1979) 442 U.S. 62, 74-75 & fn. 7 [60 L.Ed.2d 713, 724, fn. 7] (plur. opn. of Rehnquist, J.); *Gonzales*, *supra*, 52 Cal.4th at pp. 291-292; *People v. Anderson* (1987) 43 Cal.3d 1104, 1120-1121.) Here, all the jury heard was an unspecific reference to defendant's attempt to intimidate the witness with what the witness took as a threat to beat him up, which resulted only in making the witness angry. Unlike the statement that the court excluded before trial, this did not include any admission that defendant had killed before. Even the witness minimized the nature of the threat against him, not giving any indication that it actually made him fearful. This does not reach the "extraordinary" threshold that warrants a conclusion of incurable prejudice. We thus conclude the trial court did not abuse its discretion in denying the motion for mistrial.

## II. Substantial Evidence of Identity

In reviewing a judgment for substantial evidence, we resolve all conflicts in direct evidence and reasonable inferences in favor of the judgment, then determine if the record

8

thus marshaled contains more than a scintilla of evidence such that a reasonable trier of fact could have found in favor of the prosecution in light of the whole record. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632-1633.)

Defendant correctly points out that there is an absence of any evidence of motive on his part, other than the dispute with the victim some three years earlier, and despite the defendant's homelessness at the time of the murder, nothing was missing from the victim other than keys and a cell phone. Further, nothing but the prosecution DNA evidence even connected him with the crime. Where defendant goes awry, however, is in urging us to disregard this DNA evidence. He at best is arguing the *weight* we should accord the prosecution experts, asserting the defense experts were more persuasive. This is beyond the scope of our review. Absent evidence that establishes the invalidity of the opinions of the prosecution experts as a matter of law, it was for the jury to decide whom to believe. (Cf. *People v. Mayberry* (1975) 15 Cal.3d 143, 150.) We therefore reject this argument.

### III.  Instruction on Accomplice Liability

The prosecutor was concerned that the evidence of multiple DNA contributors on the murder weapon (and the use of more than one type of weapon) would suggest that there were multiple perpetrators, and thus wanted instructions on accomplice liability. The trial court agreed and instructed the jury accordingly. The prosecutor (as we noted above) also addressed this theory in closing argument, asserting that even if the presence of two types of weapons led the jury to believe that two assailants were present this would not make defendant any less culpable for the victim's death.

Defendant points out the absence of any evidence that he knew of the purpose of the hypothetical accomplice, who could have seized the bat after defendant assaulted the victim with nonlethal blows and administered the coup de grâce without defendant's intent to aid in an escalation to a lethal beating. He contends this was prejudicial error that the prosecution's argument aggravated (a cognizable claim even if his independent

9

assertion of misconduct is outside the scope of his argument and thus foreclosed (fn. 1, *ante*)). Contrary to his view, we assess prejudice under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, because federal constitutional error is not implicated where an instruction is erroneous merely because it does not have any application to the facts of the case. (*Guiton*, *supra*, 4 Cal.4th at pp. 1129-1130.) We also note the People are incorrect in asserting defendant has forfeited this claim; defense counsel had unsuccessfully objected to instructions on accomplice liability and therefore did not need to object again when the prosecutor argued the theory.

The flaw in defendant's argument is in labeling his claim to be one of instructing on a *legally erroneous* theory, in which case we would be compelled to reverse the conviction in the absence of an affirmative indication that the jury did not rely on it. (*Guiton*, *supra*, 4 Cal.4th at pp. 1128-1129.) But defendant does not identify any flaw in the pattern accomplice instructions themselves. His claim is rather one of *evidentiary insufficiency* to establish a necessary *element* of liability as an accomplice, i.e., the required mens rea. As a result, the presumption is switched: Defendant must affirmatively establish that the jury in fact relied on this factually unwarranted theory. (*Id*. at p. 1129.) He has not satisfied this burden. The prosecutor did not stress *only* accomplice liability; presentation of the theory in fact consisted of only three pages of the extensive closing arguments. Defendant also does not identify any jury communications or findings that might demonstrate a focus on accomplice liability. We therefore find that even if a theory of accomplice liability was not warranted, defendant has failed to demonstrate prejudice. (*Id*. at pp. 1129-1130.)

## IV. The Claim of Misconduct Is Forfeited

Over defense objections of relevance and hearsay, the trial court ruled the criminalist could testify that she initially submitted the samples of unknown DNA to the computer database (called "CODIS"), which made a partial match with the DNA profile

10

of defendant included in the database, for the nonhearsay purpose of explaining why the police had focused on defendant. As a result of the adverse ruling, defense counsel assented to a stipulation to this effect included in the charge to the jury, which also explained the database was a broad cross-section of over 1.6 million profiles from employment applicants (without making any reference to the inclusion of profiles from criminal defendants) and that the fact of the CODIS match was not admitted as proof of any matter.

Defendant cites four instances in closing argument where he contends the prosecutor relied on the fact of the CODIS match to bolster the accuracy of the criminalist's identification of him as the DNA contributor on the bat. He then contends (at some length) that reliance on this hearsay for the truth of the matter asserted violated his right to confrontation. In perfunctory manner, he admits that he did not raise a contemporaneous objection to this use of the evidence in closing argument, or request an admonition, but contends this should not foreclose the issue on appeal.

The failure to object *and* request an admonition forfeits the issue on appeal. (*People v. Panah* (2005) 35 Cal.4th 395, 462.) Although defendant notes his original objection to the introduction of the evidence for a nonhearsay purpose with a limiting stipulation, this does not excuse his failure to object to the prosecution's *misuse* of the evidence for the truth of the matter asserted. Defendant's "ritual incantation" that the misconduct was incurable (and thus comes within that exception to forfeiture) is insufficient. (*Ibid*.) His equally abbreviated assertion that trial counsel committed reversible error for failing to object is also insufficient to establish for purposes of direct appeal that the inherently tactical choice of whether to object to closing argument fell below prevailing professional norms. (*People v. Lopez* (2008) 42 Cal.4th 960, 966, 972; *People v. Mitchell* (2008) 164 Cal.App.4th 442, 466-467.) Accordingly, we do not reach the merits of defendant's claim.

11

## DISPOSITION

The judgment is affirmed.


$\underline{\hspace{5em}\text{BUTZ}\hspace{5em}}$, J.


We concur:


$\underline{\hspace{3em}\text{NICHOLSON}\hspace{3em}}$, Acting P. J.


$\underline{\hspace{3em}\text{MAURO}\hspace{3em}}$, J.