Filed 4/9/15  P. v. Nomesiri CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| THE PEOPLE, | C075767 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F06714) |
| v. | |
| CHINDA NOMESIRI, | |
| Defendant and Appellant. | |

A jury found defendant Chinda Nomesiri guilty of assault with a deadly weapon (a shovel), and found he personally inflicted great bodily injury on September 22, 2011, based on evidence that he hit victim Vue Cheng with a shovel numerous times after defendant's mother shot Cheng.  The jury also found defendant guilty of discharging a firearm in a grossly negligent manner and possessing a firearm by a felon, based on conduct days before the shooting.  (Pen. Code, §§ 245, subd. (a)(1), 246.3, 12012, subd. (a)(1), 12022.7, subd. (a).)  The trial court sentenced defendant to prison for six years eight months, and he timely appeals.

1

Defendant first challenges the handling of the meaning of "life" and "death" as relevant to his culpability for assault with a deadly weapon. On the particular facts of this case, we agree that the trial court should have instructed that if Cheng were already dead from the gunshot wound at the time defendant hit him, no assault by defendant occurred. However, we find the error harmless for reasons we explain. We also reject related claims of no substantial evidence and prosecutorial misconduct.

Second, defendant challenges the admission into evidence of his pretrial statements on two grounds, claims that are forfeited for lack of any motion to exclude the statements on these grounds. Third, defendant contends he is not liable for restitution based on funeral expenses. For reasons we shall explain, we remand for a hearing to determine any relevant details of funeral and other costs. We affirm the convictions and sentence, but vacate the restitution award and remand with directions.

## BACKGROUND

Defendant's family grew marijuana in their backyard, and there were alarms in place to alert the family of attempted raids. On September 18 or 19, 2011, defendant, a convicted felon, fired a .22-caliber Iver Johnson carbine rifle into the air to scare off potential raiders (counts one and two, grossly negligent discharge and firearm possession by a convicted felon).

On the night of September 22, 2011, victim Cheng was among those attempting another raid, and defendant's mother shot Cheng in the neck.[1] Defendant then bashed Cheng repeatedly in the head with a shovel as he lay on the ground (count three, assault with a deadly weapon with personal infliction of great bodily injury).

---

[1] Defendant's mother, originally a codefendant charged with involuntary manslaughter (Pen. Code, § 192, subd. (b)), died before trial, on November 24, 2012.

When two officers arrived and examined Cheng, they each detected a pulse, and one heard Cheng gasping for breath. Cheng was dead when a paramedic arrived and examined him minutes later.

The People's witness, pathologist Dr. Stephany Fiore, testified the bullet wound to the neck was fatal. Death was caused by the bullet wound, not by the blows from the shovel, which caused a skull fracture, lacerations, and facial bruising that indicated Cheng was still alive when struck by the shovel. Cheng could have spoken after the gunshot, and could have lived for several minutes; a pulse detected by first responders would signal he was still alive.

Pathologist Dr. Judy Melinek, called to testify by the defense, agreed the gunshot wound to the neck caused death, but opined the resulting loss of blood to the brain would cause death within seconds. She thought "it would be unlikely to damn near impossible" for Cheng to have made noises or talked after he was shot. On cross-examination, she conceded it was possible that his heart may have continued to beat for several minutes, but believed he was dead when first struck by the shovel. In her view, under California law, the heart can still be beating, but a person can be brain dead. The bleeding did not indicate that Cheng was alive after he was shot. She conceded "brain death" was a term used in a hospital setting, not in the field.

In a pretrial interrogation, partly admitted into evidence (see Part II of the Discussion, *post*) defendant stated an alarm sounded just after 2 a.m., but he did not see anybody in the yard and went back to bed.[2] About an hour or so later, he heard something and then saw two men in the yard, one cutting at a plant with a machete or large knife, and another trying to jump the fence. Defendant screamed or yelled, and his mother fired the gun. Defendant heard one man (Cheng) on the ground speaking Hmong,

_____

[2] The parties on appeal cite to the transcript used as an aid by the jury. We do the same

3

telling his companion that he had been shot, and defendant then struck the man on the ground repeatedly with a shovel.  He hit Cheng around 10 to 20 times on his head, body, back, and legs.

## DISCUSSION

### I

### *Life or Death*

Defendant raises overlapping claims touching on the question whether Cheng was alive or dead when defendant hit him.  He first contends no substantial evidence shows Cheng was alive.  He adds that the trial court should have instructed the jury on the line separating life from death, and that his trial counsel should have requested a pinpoint instruction on the subject.  Finally, he contends the prosecutor misled the jury on this subject during part of an argument to which trial counsel failed to object.  We agree with defendant's instructional error claim, but find the error harmless based on the arguments given by both counsel.  We find substantial evidence supports the conviction, and find the prosecutorial misconduct claim forfeited.  (See fn. 3, *post*.)

A.  *Background*

The defense theory, beginning with opening statements to the jury, was that Cheng was dead before he hit the ground, and therefore the charged assault was actually on a "dead victim."  As summarized *ante*, the evidence conflicted on this point.

The prosecutor argued hitting Cheng with the shovel constituted assault with a deadly weapon, and the ensuing skull fracture constituted great bodily injury. Referencing the "battle of the experts" in the case, the prosecutor argued Cheng was still alive when defendant struck him with the shovel, as shown by defendant's statements, the testimony of the two officers, and Dr. Fiore's testimony.  The prosecutor argued that Dr. Melinek's testimony about brain death had no application to the facts shown by the evidence in this particular case.  The prosecutor conceded in argument to the jury that "if

4

[Cheng] was dead when the blows were inflicted, there is no crime . . . . This is only a crime if [Cheng] was still alive."

The defense, in reply, emphasized Dr. Melinek's testimony. Defense counsel argued that if Cheng died "as a result of the gunshot wound to the neck, there is no crime committed." He told the jury that if it concluded Cheng "was dead seconds after he was shot, there is no crime." In response, the prosecutor argued that "just because [Cheng] died of the gunshot wound . . . does not mean that he was dead when [hit by the shovel]."

B. *The Law*

We accept defendant's premise--as argued to the jury by the prosecutor and impliedly accepted by defense counsel, as well as unopposed by the People in their briefing on appeal--that assault with a deadly weapon cannot be committed upon a corpse. This comports with cases holding that mayhem or sexual assaults cannot be committed if the victim has already died. (See *People v. Kraft* (2000) 23 Cal.4th 978, 1058 [mayhem]; *People v. Kelly* (1992) 1 Cal.4th 495, 524 [rape]; *People v. Huynh* (2012) 212 Cal.App.4th 285, 304-305 [oral copulation].)

Defendant's sub-contentions are all based on his reading of Health and Safety Code section 7180, subdivision (a), part of the Uniform Determination of Death Act (Act), which provides that, "An individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessations of all functions of the entire brain, including the brain stem, is dead. A determination of death must be made in accordance with accepted medical standards." (Stats. 1982, ch. 810, § 2, p. 3099.) The purpose of the Act, as with other uniform laws, is "to make uniform the law . . . among states enacting it." (Health & Saf. Code, § 7180, subd. (b).) The goal of this statutory scheme is to standardize "death" for purposes of facilitating organ donations under the Uniform Anatomical Gift Act, and does not explicitly pertain to criminal liability. (See *id*., § 7182.) But the People do not dispute that this statutory

5

definition of death is applicable here, but instead focuses her argument on the jury's ability to choose one expert's opinion over the other.[3]

C. *Instructional Error*

Defendant contends the trial court had a duty to instruct the jury that the law required Cheng's heart be pumping and brain be functioning at the time he was hit by the shovel in order to convict defendant of assault. Alternatively, he contends trial counsel was incompetent in failing to request a pinpoint instruction.

We agree that the jury should have been instructed that if Cheng were already dead from the gunshot wound at the time defendant hit him, no assault by defendant occurred, although we do not agree with the content and form of defendant's proposed instructions. For purposes of this appeal, however, we shall assume the trial court erred by giving incomplete instructions on assault with a deadly weapon, by failing to include as an element that the People had the duty to prove Cheng was alive when struck by the shovel. However, no prejudice resulted from the omission.

Our Supreme Court repeatedly has held that in determining "whether the interplay of argument with individually proper instructions produced a distorted meaning, it seems appropriate to evaluate the remarks of both counsel to determine whether the jury received adequate information." (*People v. Brown* (1988) 45 Cal.3d 1247, 1256; see *People v. Fudge* (1994) 7 Cal.4th 1075, 1111 ["such detailed argument supports our conclusion that the error in refusing the instruction was harmless"]; cf. *People v. Champion* (1995) 9 Cal.4th 879, 950 [prosecutor's argument showed "no reasonable

---

[3] To the extent defendant contends the prosecutor committed misconduct by assuming or producing evidence that the "brain death" rules do not apply outside of the hospital context, the lack of objection forfeits the contention of error. (See *People v Bradford* (1997) 15 Cal.4th 1229, 1333.) In any event, as we explain *post*, the evidence supported the jury's implicit finding that Cheng was alive--even applying defendant's definitions of life and death--at the time he was assaulted by defendant.

possibility that the outcome of the penalty phase was affected by the trial court's failure to instruct" on a given point]; *People v. Beeler* (1995) 9 Cal.4th 953, 983-984 ["the prosecutor's closing argument foreclosed any realistic possibility of the jury not believing they had to find intent to kill"]; see also *People v. Mathson* (2012) 210 Cal.App.4th 1297, 1330-1331.)

As we have described, both the prosecutor's and defense counsel's arguments "foreclosed any realistic possibility of the jury not believing they had to find" (*People v. Beeler*, *supra*, 9 Cal.4th at pp. 983-984) that Cheng was alive when struck by the shovel. No rational jury could have been misled on this point, thus any error was harmless.

D. *Sufficiency of the Evidence*

Defendant raises the related claim that no substantial evidence supports the assault verdict because it was not proven that Cheng was alive when assaulted.

Evidence a body was warm when found, a foot was seen to move, and a pathologist thought there was some bleeding which " 'probably' occurred postmortem, although it might have happened 'perimortem,' or around the time of death" was sufficient to show the victim had been alive in a mayhem case. (See *People v. Kraft*, *supra*, 23 Cal.4th at p. 1058.) And where conflicting experts disagreed about whether penetration *necessarily* would have led to hemorrhaging in a perineal tear if the victim had been alive, our Supreme Court upheld the jury's resolution of that factual dispute. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 660-661.)

During pretrial proceedings in this case, the trial court observed that "in watching the videotape [of defendant's interrogation], it appeared relatively clear that [defendant] was aware that the individual who had been shot was dying, but was far from dead at the time the shovel was being leveled on him." The trial court denied a defense motion for an acquittal based in part on the same reasoning, as well as the testimony of the two officers who detected Cheng's pulse when they arrived. The jury was presented with this evidence, plus conflicting expert opinions, one of which opined defendant's wounds from

7

the shovel had been inflicted before his death based on the pattern of bruising and the degree of bleeding beneath the scalp.

Defendant's argument on appeal in effect disregards the substantial evidence rule, which requires us to view the evidence in the light most favorable to the verdict, to determine if credible, solid, evidence supports the conviction. (See *People v. Raley* (1992) 2 Cal.4th 870, 891; *People v. Barnes* (1986) 42 Cal.3d 284, 303-304.) Defendant's own statements that he heard Cheng *speak* before he hit him ("I grabbed the shovel and then I go over to hit that guy cause he was like. . . .he was telling his friend he was like I'm shot or something like that. . . . And I just went in, I went in and hit him") belie his contention on appeal. The jury could have accepted that admission, which *by itself* shows Cheng was alive (by any definition) when the assault began. Further, the People's expert testified the injuries were inflicted before death, and the defense expert's disagreement does not render the People's evidence insufficient. Even assuming for the sake of argument that the presence of a pulse is insufficient in and of itself to show life for purposes of criminal law, the testimony of two officers that they felt a pulse corroborated defendant's own inculpatory admissions that Cheng was alive and speaking immediately before the assault.

II

*Defendant's Inculpatory Admissions*

Defendant contends his pretrial statements should have been suppressed because they were involuntary and the police did not follow *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

Defendant did not move to suppress his statements on these grounds, nor interpose *Miranda* or involuntariness objections when they were introduced into evidence, therefore he forfeited the claims. (See *People v. Milner* (1988) 45 Cal.4th 227, 236-237.)

Defendant did move to exclude the statements based on the lack of an accurate transcript. The trial court directed the parties to meet and confer about which portions of

8

the interrogation were proposed for admission, and said it would review the transcript for accuracy, and did so, making edits as appropriate. After making those changes, the trial court denied the defense motion to exclude the statements based on an imperfect transcript, and emphasized that the jury would be instructed that the transcripts were merely an aid to following along with the videotape of defendant's statements. Counsel reached an agreement about which portions of the statement would be introduced, and the jury was admonished that the videotape, not the transcript, was evidence.

But defendant never suggested that his statements were involuntary or the product of *Miranda* violations, and cannot raise those claims now.

Defendant's effort to recast the contention as one of ineffective trial counsel for failing to object to the statements fares no better, because the record on appeal does not demonstrate that either a *Miranda* or voluntariness objection would have been successful. " '[T]he mere failure to object rarely rises to a level implicating one's constitutional right to effective legal counsel.' " (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 467.)

The transcript shows defendant told Detective Heinlein that he was "exhausted," but he then answered questions for a long time, with no evident hesitation. He was advised of his *Miranda* rights, described by Detective Heinlein as "a protocol that we have to go by" but, contrary to defendant's view, this use of the term "protocol" did not minimize or obscure those rights. Detective Heinlein explained the right to remain silent, the fact anything defendant said may be used against him, he had the right to an attorney before questioning, and he had the right to appointment of an attorney free of charge before any questioning if defendant could not afford to pay an attorney. Then defendant freely and openly answered Detective Heinlein's questions. Nothing suggests any overbearing conduct leading to an involuntary admission, or violation of the dictates of *Miranda*. On this record, the claim of ineffective trial counsel is baseless.

9

III

*Restitution Order*

Defendant makes three separate attacks on the restitution order, which we address in a different order than presented in his briefing.

Cheng's common law wife told the probation officer she had been with Cheng for 10 years and they had three children together. She had spent $40,000 on funeral expenses and attending counseling. The trial court awarded her $40,000 in restitution.

Defendant, noting that California does not permit common law marriage, first asserts Cheng's widow had no standing to seek restitution. However, if she and Cheng had entered into a valid common law marriage elsewhere, California would recognize that marriage, notwithstanding California's own prohibition on common law marriages. (Fam. Code, § 308; see *Etienne v. DKM Enterprises, Inc*. (1982) 136 Cal.App.3d 487, 490.) Therefore, it was incumbent on defendant to object to this portion of the probation report, and to the widow's statement read at sentencing, to preserve the fact-based claim as to whether she had actually been Cheng's wife. The failure to lodge a specific factual objection to the contents of the probation report forfeits the contention on appeal. (See *People v. Evans* (1983) 141 Cal.App.3d 1019, 1021.) Moreover, by statute, a "victim" includes a person who sustained economic loss as a result of the crime and who either was living in the household of the victim or had lived in the household for at least two years in a relationship substantially similar to the relationship of spouse. (Pen. Code, § 1202.4, subd. (k)(3) (A), (B) & (C); see *People v. Crisler* (2008) 165 Cal.App.4th 1503, 1507-1508.) Defendant does not explain why a common law spouse, even if not technically a legal spouse for other purposes in California, would not qualify as a victim under this statute.

Similarly, defendant's contention the widow's claimed figure of $40,000 was "triple hearsay" is forfeited by his failure to interpose a hearsay objection at sentencing. (Evid. Code, § 353, subd. (a); see *People v. Suff* (2014) 58 Cal.4th 1013, 1075-1076

10

[failure to object promptly at penalty phase forfeits objections to evidence].) A statement of losses in the probation report will support an award in that amount, absent a timely challenge. (See *People v. Keichler* (2005) 129 Cal.App.4th 1039, 1048; Couzens, Bigelow & Prickett, Sentencing Cal. Crimes (The Rutter Group 2013), Victim Restitution, § 16:1.)

Defendant's more serious contention is that because the trial evidence clearly proved that the shovel attack did not cause Cheng's death, it was inappropriate to charge him with funeral expenses. Defense counsel objected on this ground at sentencing, and we agree with defendant in part on this point.

Penal Code section 1202.4, subdivision (a)(1) provides for restitution for loss "as a result of the commission of a crime." Section 1202.4, subdivision (f) refers to restitution for "economic loss as a result of the defendant's conduct." Defendant was not charged with or convicted of any crime causing Cheng's death, and there is no evidence that Cheng's death resulted from the crime of which defendant stands convicted.[4] It is possible, however, that some of Cheng's widow's expenses for Cheng's burial may have resulted from defendant's crime. If she paid to make the body presentable for viewing, for example, due to damage caused by the shovel, these charges resulted from defendant's conduct and would be properly attributed to him. Similarly, if part of the

---

[4] There are cases involving the propriety and scope of restitution in cases of hit and run (Veh. Code, § 20001) that turn on their facts, including whether the defendant received probation or a prison sentence. Our Supreme Court has granted review to address some of these issues. (*People v. Martinez*, review granted Sept. 10, 2014, S219970.) We will not delve into that subject in this case, because the People did not attempt to show defendant's act of hitting Cheng with the shovel contributed in any way to Cheng's death. *People v. Rubics* (2006) 136 Cal.App.4th 452, on which the People rely is distinguishable for two reasons: (1) the facts showed an accident was caused by the defendant's unsafe driving; and (2) the defendant was granted probation, not sent to prison as in this case. (See *id.* at pp. 456-462.)

family's counseling was related to the disfigurement of Cheng's body, those expenses, too, would be compensable.

Accordingly, we remand with directions to conduct a new restitution hearing to identify what part, if any, of the funeral or counseling expenses were causally attributed to defendant's conduct in striking Cheng with a shovel after Cheng had been shot.

## DISPOSITION

The judgment is affirmed, but the restitution order is vacated and the cause remanded for a new restitution hearing consistent herewith.

                                                    DUARTE , J.

We concur:

BLEASE , Acting P. J.

BUTZ , J.

12