Filed 3/9/22  P. v. Nance CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JEREMY NANCE,<br><br>    Defendant and Appellant. | C089866<br><br>(Super. Ct. No. 08F09790) |

Defendant Jeremy Nance appeals from the trial court's order extending his period of commitment to the Department of State Hospitals until May 9, 2021, under Penal Code section 1026.5.[1]  Defendant contends the trial court violated his rights to equal protection and due process by instructing the jury that it was his burden to prove that medication made him no longer dangerous to others.  Defendant has forfeited this claim by failing to

---

[1]  All undesignated statutory references are to the Penal Code.

1

raise it in the trial court. Defendant's remaining claim that the trial improperly allowed brief testimony about CONREP, a conditional release program, is without merit. We will affirm the trial court's order.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      Pretrial Proceedings

On November 6, 2018, the Sacramento County District Attorney filed a petition under section 1026.5, subdivision (b), to extend defendant's commitment in Atascadero State Hospital beyond its May 9, 2019 expiration date. The petition stated that, on December 21, 2011, defendant was found not guilty by reason of insanity (NGI) for sexual battery against the will of a person institutionalized for medical treatment who is seriously disabled or medically incapacitated. The acting medical director of the hospital had good cause to believe that, by reason of defendant's mental disease, defect or disorder, he represented a substantial danger of physical harm to others.

### B.      Trial

Trial commenced on June 13, 2019.

On that day, defendant submitted a packet of proposed model jury instructions, including CALCRIM No. 3453.

Defendant also proposed a pinpoint instruction: "You cannot find that there is a 'substantial danger of physical harm' unless you find, beyond a reasonable doubt, that [defendant] has a disorder that seriously impairs his ability to control dangerous behavior." As supporting authority, defendant cited the bench notes to CALCRIM No. 3453, *People v. Sudar* (2007) 158 Cal.App.4th 655, *In re Howard N.* (2005) 35 Cal.4th 117, and *Kansas v. Crane* (2002) 534 U.S. 407.

#### 1.      Prosecution's case

##### a.      Dr. Ana Kodzic

Dr. Kodzic testified as an expert in psychology and forensic evaluation.

2

Dr. Kodzic interviewed defendant on June 5, 2019, and reviewed his hospital records. In her professional judgment, defendant should be retained and treated at Atascadero State Hospital.

Defendant's most recent commitment to Atascadero State Hospital was in 2012. He was diagnosed with bipolar, antisocial personality and methamphetamine disorders. Bipolar disorder involves periods of mania and depression. During the manic period, individuals have increased energy, may go days without sleep, have decreased appetite, are sometimes irritable, can be hypersexual, engage in risky behaviors, and can have lots of ideas and creativity. The depression period involves a prolonged period of sadness, oversleeping, overeating, suicidal thoughts and feelings of worthlessness. Defendant has exhibited increased energy, decreased need for sleep, hypersexuality, irritability, "pressured speech," "flight of ideas," and possible psychosis, followed by depressive episodes.

Dr. Kodzic testified to her belief that defendant does not think he has bipolar disorder. At times, defendant has admitted he has the disorder and at times denied it. In the interview, defendant stated that he had bipolar disorder, but then said he was first diagnosed at age 26 and another point at age 15, which was inconsistent with acknowledging to having the disorder.

Antisocial personality disorder refers to a person with a lifetime of difficulty following rules, abiding by the law, and respecting the rights of others. Dr. Kodzic testified that defendant meets all these criteria. Dr. Kodzic reviewed hospital records to determine whether defendant had behaviors or characteristics consistent with antisocial personality disorder. Dr. Kodzic reviewed the notes of Dr. Gabrielle Paladino, a staff psychiatrist at Atascadero State Hospital and defendant's clinical psychiatrist, stating that she felt uncomfortable and threatened when defendant would stand close to her and loom over her. In the interview, defendant indicated he was aware that could come across as intimidating and threatening, which suggested that it was not an accident that he behaved

3

this way towards his psychiatrist. In addition, when discussing that several patients had accused him of forcing them into sexual activity, defendant said they were jealous and lied but then said sometimes he was too assertive and they could feel intimidated. Defendant appeared to know that he made people uncomfortable but did not know why or care.

Defendant acknowledged using methamphetamine and cannabis. He said drugs and alcohol might be a trigger for sexually offending in the future, but these drugs were not involved in his sexual offenses. Dr. Kodzic got the impression defendant was giving a scripted answer he learned from substance abuse groups he attended. Defendant said he attended to get out of the hospital.

Defendant talked about using cannabis and methamphetamine "occasionally to help me work." Cannabis is not problematic for bipolar individuals. Defendant would not present a danger because he smoked marijuana. On the other hand, methamphetamine was a concern. People do not use methamphetamine recreationally. A methamphetamine high often looks like mania and psychosis. Individuals using methamphetamine have increased energy, lowered inhibitions, lower impulsivity, and hypersexuality. Defendant was likely manic when he was found NGI for sexual battery. Dr. Kodzic saw the potential of methamphetamine to trigger mania as "a huge risk factor." She was concerned that defendant was not worried about putting himself in the same or similar situation in which he was when he committed his NGI crime.

Defendant's current offenses consisted of seven counts of false imprisonment and one count of sexual battery. The sexual battery offence occurred at a CONREP facility. CONREP is a supervised conditional release program to help individuals found NGI to go from the hospital to the community, providing assistance with housing, treatment, medication, social security and addiction management. The program is for individuals who more likely than not will be safe at a community facility. Defendant described the conduct underlying the sexual battery charge as his being attracted to an individual who

4

came on to him and taking the individual up on the offer. Defendant said he then "pushed myself on him." Defendant minimized the incident, saying it was wrong but he thought the individual was interested. Asked whether his bipolar disorder contributed to the offense, defendant said it did not when Dr. Kodzic last spoke to him, but previously defendant said he was manic at the time. Inconsistency is a risk factor that the person will do what he did again. What triggers offensive behavior may or may not be related to severe mental illness, so it is important for defendant to understand why he did what he did. It is difficult to work on a relapse prevention plan when defendant's story is inconsistent.

Dr. Kodzic's conclusion regarding whether defendant presented a substantial risk of physical harm to others was that he could benefit from further treatment. Defendant was making progress but was not done with sexual offender treatment. Defendant had completed treatment for substance abuse but he told Dr. Kodzic he did not have a drug problem.

Dr. Kodzic's main concern was that defendant does not believe he has a mental illness and needs medication. In October 2018, defendant said he did not need medication, but, in the recent interview, defendant said that he did. Dr. Kodzic did not believe that defendant had good insight into his mental health treatment. She did not believe he would continue to take medication if he were released from the hospital. If he did not take medication, defendant would pose a greater risk. Defendant has many times requested to be taken off medication and, when given the chance, attempted to stop taking medication. Defendant would not take medication and would likely have a manic episode at some point. Dr. Kodzic hoped that with further treatment defendant would realize that he does have a mental illness and needs medication.

On cross-examination, Dr. Kodzic admitted that, in October 2018, defendant said he needed to be on medication for the rest of his life and told Dr. Kodzic the importance

5

of taking medication. Defendant said that if his medication was not working, he would relapse. He said he would take his medication, so he would not relapse.

Defendant said that having healthy relationship skills and mutually consensual sexual exchanges were important. Dr. Kodzic admitted defendant's sex offender treatment providers said that he had completed two out of three modules and was on the third module.

Defendant told Dr. Kodzic that Zyprexa puts him to sleep and he was worried about weight gain and diabetes associated with the drug. Since being treated with Zyprexa in 2011, defendant's bipolar disorder symptoms have been controlled. During the interview, defendant told Dr. Kodzic that his insistence that he would take his medication was "unwavering." In her report, Dr. Kodzic wrote that defendant said he understands that some of his peers might have felt threatened by him and he understands his effect on people now.

On redirect examination, Dr. Kodzic described a conversation with defendant about an incident where another patient came into his room uninvited. Defendant said the man came into his room and tried to fight him. Defendant beat him up and threw him out in the hallway. Then defendant told staff.

### b. Dr. Gabrielle Paladino

Dr. Paladino testified as an expert in psychiatry. She was defendant's clinical psychiatrist for eight months in 2018 and currently has been since January 2019.

Defendant has been diagnosed with bipolar, antisocial personality and substance abuse disorders. The symptom of bipolar disorder that Dr. Paladino has seen in defendant is irritability. Defendant has been prescribed Zyprexa for bipolar disorder. Dr. Paladino testified that Zyprexa is the "gold standard" for treating bipolar disorder. The three main side effects of Zyprexa are weight gain, constipation and metabolic syndrome, which is like prediabetes. Zyprexa helps regulate mood, concentration and clarity of thinking.

Defendant asked Dr. Paladino to stop Zyprexa because he didn't need it. Zyprexa has been the best medication to keep defendant's bipolar disorder under control. Defendant didn't suggest an alternative because he wanted to stop all medication. He requested this on a number of occasions. This was a big concern for Dr. Paladino because defendant likely started showing symptoms of bipolar disorder at an early age and the younger a person is when they develop symptoms the more challenging the case. The biggest problem for people with bipolar disorder is change; a change in medication could trigger mania or depression.

Dr. Paladino testified that defendant started having problems with the law and authority at age 15. Antisocial personality disorder that develops by age 15 is likely to persist.

Defendant has exhibited worrying behavior in the hospital. In May 2017, a hospital policewoman expressed concern that defendant had invaded her space, and, when she tried to talk to him about it, he walked away and refused to talk about it.

Dr. Paladino has felt uncomfortable with defendant when they are both standing, because he towers over her (he is 13 or 14 inches taller) and has gotten very emphatic. Defendant was not aware that space needs to be maintained because of the difference in height.

Defendant accepts that he has bipolar disorder but does not think he needs to be treated with medications. Dr. Paladino has heard defendant state that he won't take medication if he is released. She overheard him say this to a group of patients. Defendant said his plan is to stop taking medication. Dr. Paladino found this worrisome because bipolar disorder has a high rate of relapse. Medication is used to keep mood stability in place.

Dr. Paladino testified that her recommendation is that defendant be retained and treated. The medication issue needs to be ironed out.

Dr. Paladino testified that defendant being a sex offender is a challenge. Defendant is not willing to talk about learning the skills to be safe in society. In the past, defendant has gone to sex offender groups but recently he has not been going. It is important for defendant to have specific boundaries with other patients because they could be potential victims. Defendant has not been transparent with staff, which is important because sex offenses are done in secret and a person who is signaling his intent about everything is going to be more safe for the community.

Defendant has indicated his release plan is to stay with his mother, potentially work for her business, and go to 12-step meetings. But defendant not taking his medications is a problem. Dr. Paladino does not believe that defendant's release plan is adequate to ensure his safety and safety of others.

On cross-examination, Dr. Paladino admitted that defendant had a right to stop his medication and she gives him credit for not doing that. Dr. Paladino also admitted that it is possible for a person who had bipolar disorder to function without medications. Dr. Paladino gave defendant credit for being transparent, with the trial coming up, that he dislikes his medication.

    **c.**  **Dr. Roxanne Rassti**

Dr. Rassti testified as an expert in forensic psychology.

Dr. Rassti was a forensic evaluator for defendant in January 2018 and August 2018. Dr. Kodzic took over for Dr. Rassti in that capacity.

In August 2018, defendant told Dr. Rassti that he felt his medications made him worse and he would feel better and be more culturally, emotionally and spiritually better off if he weren't on his medications. Defendant complained that Zyprexa was causing him anxiety, but this is not a common side effect of the drug. Defendant said he was taking the medication because he had to and never said he wanted to.

Defendant said his precursor and trigger for violence is when he is feeling "out of whack," which he described as using drugs and that would be a way for him to tell that was not doing well and prone to violence.

Defendant and Dr. Rassti talked about his first using and selling drugs at age 14 and that it was the reason for some of his aggression and psychiatric problems. Defendant attributed some of his problems when released from prison around age 24 or 25 to using methamphetamine.

Dr. Rassti attempted to speak with defendant about committing a sex offense, his problematic behavior in the hospital, and need for treatment for such offenses. Dr. Rassti told defendant he would need to complete treatment to reduce risk and made it clear this was an expectation before he could be discharged from the hospital. Defendant has not completed treatment programs. Defendant said he did not believe he needed sex offender classes or treatment and did not feel like doing it.

Defendant had previously been in a CONREP facility but told Dr. Rassti he did not want to be discharged through CONREP or any similar program.

On cross-examination, Dr. Rassti admitted that in January 2018 she made the determination that defendant's insight and judgment were considered fair because he acknowledged having a mental illness and needing medications. Dr. Rassti acknowledged that in January 2018 and August 2018 defendant did not want to be on medication but did not refuse medication.

2.      **Appellant's case**

a.      **Dr. Christopher Fisher**

Dr. Fisher previously worked as a treating and forensic psychologist at Napa State Hospital, mostly on cases involving NGI and mentally disordered offenders (MDO). Dr. Fisher testified as an expert witness.

Dr. Fisher interviewed defendant for just under two hours in March 2019 and reviewed his hospital records. Defendant presented reasonably well for a person with

9

bipolar disorder. There were no obvious signs of a mental disorder. Defendant was not manic or overly depressed during the interview.

Defendant was clear that his medications were central in helping him maintain an even emotional keel and behaving better at the hospital. Defendant spoke about two significant side effects of Zyprexa: fatigue and weight gain/metabolic syndrome. These are common side effects. Defendant did not like the side effects, but he liked his medication in terms of helping him to maintain a stable mood.

Defendant talked about serving on the ward government, a volunteer position. He did so out of motivation to improve the environment there, which is a "prosocial" behavior.

Defendant told Dr. Fisher about his participation in a cognitive behavioral intervention that related to past sex offense issues and substance abuse maintenance groups. Defendant said the group's work on developing appropriate relationship skills and good interpersonal and sexual boundaries with people for when he's released from the hospital and stable in the community.

In discussing future plans, defendant knew that drugs and alcohol could be a slippery slope. He said he was committed to staying away from them and attending Narcotics Anonymous and Alcoholics Anonymous.

Defendant wants to get out and reunite with his family, which he hasn't been able to do for 15 or 16 years.

Defendant said his symptoms of mental illness were in remission, no severe ups and downs, which he attributed to his medication. Defendant was clear that while he has changed in some important ways, his need for medications is central and he has to take them for the rest of his life. Defendant said if he starts thinking he doesn't need medications, he's going to consult with psychiatrists and his mother, who understands his mental health history, and he is going to take their advice. Defendant said he would not

stop taking his medications when he left the hospital; he's going to need them forever, and that's the nature of mental illness.

Defendant attributed his increased stability to treatment groups over the last few years where he matured. Defendant said he used to be impulsive and act out, but he has been making a concerted effort to think before he acts. His prior sexual acting out was part of the irresponsible and selfish way he used to act, but he has been able to avoid that over the last three-plus years.

If defendant went back into the community, he might experience a "red flag" that his mental state was deteriorating. Defendant said he would be looking for red flags like not sleeping well and racing thoughts and euphoria when he is manic, early warning signs that he needs intervention from a trusted person, either a doctor or family member.

Defendant recognizes that irritability in the past has led to angry outbursts, which landed him in legal trouble and harmed his relationships. If it becomes a pattern and family members are giving him feedback, he is going to accept it because of his past problems.

Defendant said he was planning to see a county mental health psychiatrist once a month.

Dr. Fisher diagnosed defendant with antisocial personality disorder. Since 2016 or 2017, there has been improvement in antisocial personality traits and an increase in prosocial personality traits, which is not uncommon for people as they get older. Dr. Fisher continued to offer this diagnosis because irresponsibility is a criterion of antisocial personality disorder and defendant continues to be somewhat irresponsible, immature and impulsive.

Dr. Fisher testified that his opinion is that, in his present mental state, defendant does not represent a substantial danger to other people. Defendant is able to control his behavior. Medication has helped defendant control his behavior and he will continue to take his medication once released in the community.

11

On cross-examination, Dr. Fisher acknowledged that defendant was released into a CONREP program in 2008, which was revoked because of sexual battery on another individual. Dr. Fisher talked with defendant about this encounter. Defendant made it seem to be a consensual encounter. Sometimes he admitted that it was not consensual in part. Dr. Fisher admitted that defendant has never told a consistent story about what happened.

### b. Pamela Nance

Ms. Nance is defendant's mother.

Ms. Nance has called defendant every day for the last 23 years. Defendant has never said he does not have a mental disease and he doesn't have to take his medications when he gets out of the hospital.

Ms. Nance testified that defendant will live with her and work in her housecleaning business. Defendant's uncle has a car on Ms. Nance's property that he wants to restore with defendant. Defendant's uncle helped raise defendant and was a mentor to him.

Ms. Nance and defendant's father are not married but remain friends and work together on defendant's behalf. Defendant's father and his wife are willing to help defendant with financial support and transportation.

Ms. Nance testified that her primary care physician will help with signing defendant up to see a psychiatrist in South Lake Tahoe and Ms. Nance has reached out to a behavioral provider in Placerville. Ms. Nance also checked out a church called Bipolar Insight in the area, which provides counseling and has been extremely successful. Ms. Nance has the telephone number of a 24-hour crisis line through Barton Memorial Hospital that also provides tele-psychiatrist services.

Ms. Nance acknowledged that defendant is a registered sex offender. She testified that she would not be taking defendant into homes where children were present. Most of

the homes she cleaned are the second homes of wealthy people from San Francisco. Her clients know about defendant and have been supportive.

On cross-examination, Ms. Nance admitted she did not know that defendant refused to attend his sexual offender treatment program at the hospital.

### 3. The Verdict

The jury found that defendant suffers from a severe mental disorder that causes him to represent a substantial danger of physical harm to others. On June 21, 2019, the trial court entered an order extending defendant's commitment to May 9, 2021.

**DISCUSSION**

I

*CALCRIM No. 3453. Extension of Commitment*

Defendant agrees that the decision in *People v. Bolden* (1990) 217 Cal.App.3d 1591 supports CALCRIM No. 3453, which required defendant, as an affirmative defense to recommitment under section 1026.5, to prove by a preponderance of the evidence that he was not a substantial danger to others, because he is taking medication that controls his mental condition and will continue to take medication in an unsupervised environment. Defendant contends "[h]owever, the *Bolden* case should no longer be viewed as good law because it violates [defendant's] equal protection rights." Defendant contends that MDOs are similarly situated to NGIs but MDOs "do not bear the burden of proof on the medication issue," therefore defendant's "equal protection rights were violated because he was required to bear that burden even though he was similarly situated and there is no compelling governmental interest justifying the differential treatment." Defendant further contends that CALCRIM No. 3453 violates his due process rights, "because it effectively told the jury that they were to decide whether [defendant] was dangerous as a result of his mental illness without regards to treatment or medication for that illness."

13

We agree with the People that defendant has forfeited his challenges to CALCRIM No. 3453 by failing to raise these claims in the trial court.

As noted, defendant submitted CALCRIM No. 3453 as part of his packet of proposed instructions. During a discussion on motions in limine, the court inquired about affirmative defenses where defendant bore the burden of proof and defense counsel responded, "The defense is if he's, he's on medication that controls his symptoms . . . the symptoms that would otherwise make him dangerous. And if released, he would remain on that medication." At the close of evidence—after an informal discussion with counsel for the parties not reported in the trial transcript—the court included CALCRIM No. 3453 in the finalized set of instructions.

The trial court instructed the jury with CALCRIM No. 3453 as follows:

"[Defendant] has been committed to a mental health facility. You must decide whether he currently poses a substantial danger of physical harm to others as a result of a mental disease, defect or disorder. That is the only purpose of this proceeding. You are not being asked to decide [defendant's] mental condition at any other time or whether he is guilty of any crime.

"To prove that [defendant] currently poses a substantial danger of physical harm to others as a result of mental disease, defect or disorder, the petitioner must prove beyond a reasonable doubt that[:]

"1.    He suffers from a mental disease, defect or disorder; and

"2.    As a result of his mental disease, defect or disorder, he now:

"A.    Poses a substantial danger of physical harm to others; and

"B.    Has serious difficulty in controlling his dangerous behavior.

"Control of a mental condition through medication is a defense to a petition to extend commitment. To establish this defense, [defendant] must prove by a preponderance of the evidence that[:]

14

"1. He no longer poses a substantial danger of physical harm to others because he is now taking medication that controls his mental condition; and

"2. He will continue to take the medicine is an unsupervised environment.

"Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true."

In closing argument, the prosecutor acknowledged that defense counsel would present an affirmative defense that defendant could control his potential for harm with medication and that the burden was different from what the prosecution had to prove beyond a reasonable doubt. "It's a lower burden than reasonable doubt. . . . So I don't want you to think that he has to have the same obligation upon him to show that [defendant] will take his medication, because he does not." Beyond this affirmative defense, the prosecutor acknowledged that defendant "would have no burden. It would all be on me."

Defense counsel took up this subject in closing argument to the jury: "I have a bit of a burden in this case as well, you see, because one defense to the allegation that you can't control your dangerous behavior in a case such as this is that you take a medication that helps you control it. . . . [Defendant] takes Zyprexa, and the doctors tell you it has been very effective in controlling his dangerous behavior.

"In fact, since he's taken it, he has been able to. He's had no serious -- he's had no incidents even considered serious since 2016.

"Now, this is where I think if I'm sitting in your chair, I think I start going to work. I have to prove by a preponderance of the evidence and you need to be convinced by a preponderance of the evidence, evidence that is not so high that you have to exclude every logical possibility otherwise. That standard is a little bit lower.

"Evidence that is more compelling on one side or the other that [defendant] will continue to take that medication when he is out in our environment."

15

On this record, we conclude that defendant forfeited his current challenges to CALCRIM No. 3453, which correctly stated the law as set forth in *Bolden*, by not objecting but rather proposing the instruction at trial and relying on the lower burden of proof in the instruction for the medication affirmative defense in seeking release from the hospital.  (See *People v. Jackson* (2016) 1 Cal.5th 269, 335-336 [defendant forfeited objection by approving pattern instruction]; *People v. Campbell* (2020) 51 Cal.App.5th 463, 498 ["As a general rule, failure to object to an instruction forfeits the issue on appeal"].)

Defendant contends that his failure to object to CALCRIM No. 3453 is excused because *Bolden* was "long and well established precedent" and "any attempt to raise [the equal protection] issue would have been futile."  In *People v. Dunley* (2016) 247 Cal.App.4th 1438, the court exercised its discretion to address an equal protection claim notwithstanding the defendant's failure to raise it at trial, because at the time "it would not have been unreasonable to assume that an objection would have been futile" based on existing case law contrary to the claim, "and we do not require parties to make futile objections."  (*Id.* at p. 1447.)  That is not the situation here.  As defendant acknowledges, he cites as support for his equal protection claim *People v. McKee* (2010) 47 Cal.4th 1172, 1203 (MDOs and sexually violent predators (SVPs) are similarly situated), *People v. Curlee* (2015) 237 Cal.App.4th 709, 721 (SVPs and NGIs are similarly situated), and *People v. Noble* (2002) 100 Cal.App.4th 184, 189-190 (pattern instruction on affirmative defense based on *Bolden* violates due process for MDOs), as well as *Dunley*, which "were all published well before his trial."  In other words, the same appellate authority for an equal protection challenge to *Bolden* and CALCRIM No. 3453 on appeal existed at the time of trial.  We do not presume that an objection

16

relying on the same authority offered to persuade us on appeal would have been futile in the trial court.[2]  (See *People v. Merriman* (2014) 60 Cal.4th 1, 84.)

Next, defendant contends he "actually raised this issue in a somewhat backhanded way without making a direct equal protection argument" via his proposed pinpoint instruction to the jury that:  "You cannot find that there is a 'substantial danger of physical harm' unless you find, beyond a reasonable doubt, that [defendant] has a disorder that seriously impairs his ability to control dangerous behavior."  Defendant maintains this instruction reached the issue of whether his behavior was controlled by medication.  But, as the trial court correctly concluded, this proposed instruction simply reiterated the language in CALCRIM No. 3453 that the People must prove beyond a reasonable doubt that defendant "[h]as serious difficulty in controlling his dangerous behavior."  Indeed, the supporting authority defendant cited for the instruction is the case law that added this language to CALCRIM No. 3453.  (See, e.g., *People v. Sudar, supra*, 158 Cal.App.4th at p. 662 [former CALCRIM No. 3453 "should be modified to include the requirement . . . that the prosecution prove the person to be committed could not control his dangerous behavior"]; Judicial Council of Cal., Crim. Jury Instns. (2021) Bench Notes to CALCRIM No. 3453 ["The court has a sua sponte duty to instruct on the standard for extending commitment, including the constitutional requirement that the

---

[2] Defendant notes an equal protection claim was not raised in *Bolden* but a due process claim was.  He argues "[s]ince that issue was directly raised in *Bolden*, any objection to that instruction on [due process] grounds would have been futile."  To the extent defendant suggests the futility excuse is more apt for his due process claim, as noted, the court in *Noble* held that a jury instruction based on *Bolden* requiring the defendant to prove the affirmative defense of medication violated due process for MDOs.  (*People v. Noble, supra*, 100 Cal.App.4th at pp. 190-191.)  Thus, *Noble* was supporting authority that existed at the time of trial for both equal protection and due process claims against *Bolden* and CALCRIM No. 3453.

17

person be found to have a disorder that seriously impairs the ability to control his or her dangerous behavior," citing *Sudar*].)

Lastly, defendant asserts that these issues were not waived because they affected his "substantial rights." Section 1259 provides that "[t]he appellate court may also review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." " 'Substantial rights' are equated with errors resulting in a miscarriage of justice" under *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 465 (*Mitchell*); *People v. Campbell, supra*, 51 Cal.App.5th at p. 499.) Under *Watson*, "a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, at p. 836; *Campbell*, at p. 499.) Assuming arguendo that the jury were instructed that the People had to prove beyond a reasonable doubt that defendant would not continue to take the medication that controlled his mental condition if released, we find no reasonable probability that the jury would reach a different conclusion than it did. The People presented two forensic psychologists and a treating psychiatrist, all of whom testified to defendant's statements that he wanted to discontinue his medication and did not believe he needed it. Most tellingly, defendant was overheard declaring to other patients that he intended to discontinue medication if released. Only defendant's retained expert, who basically took defendant's word for it, and his mother, Ms. Nance, testified otherwise. On this record, there was no reasonable probability that CALCRIM No. 3453 modified as defendant contends it should be would have led to a different outcome. (*Campbell*, at p. 500.)

## II

### *Ineffective Assistance of Counsel*

Defendant contends that if his claims that CALCRIM No. 3453 violated his equal protection and due process rights were forfeited because his counsel did not object to the instruction on these grounds, "that failure constitutes ineffective assistance of counsel."

As we commented in *Mitchell*, this claim "has increasingly become the favored means by which appellate defense counsels attempt to avoid any and all claims of forfeiture. In effect, if an issue was forfeited, then trial counsel's representation must have been deficient, and the issue must be considered anyway to determine if the ineffective assistance resulted in prejudice. However, that is not the applicable standard." (*Mitchell, supra*, 164 Cal.App.4th at p. 466.)

"Under both the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution, a criminal defendant has a right to the assistance of counsel. [Citations.] This right 'entitles the defendant not to some bare assistance but rather to *effective* assistance.' [Citation.] ' "[I]n order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof." ' [Citation.]" (*Mitchell, supra*, 164 Cal.App.4th at pp. 466-467.)

" '[T]he mere failure to object rarely rises to a level implicating one's constitutional right to effective legal counsel.' [Citation.] If, as here, the record fails to show why counsel failed to object, the claim of ineffective assistance must be rejected on appeal unless counsel was asked for an explanation and failed to provide one or there can be no satisfactory explanation. [Citation.] 'A reviewing court will not second-guess trial counsel's reasonable tactical decisions.' [Citation.]" (*Mitchell, supra*, 164 Cal.App.4th at p. 467; see also *People v. Henderson* (2020) 46 Cal.App.5th 533, 549.)

In this instance, defendant contends his trial counsel had no "valid tactical reason" for failing to challenge CALCRIM No. 3453, because it was "virtually certain that the district attorney would not have been able to make the necessary showing that would have been required under equal protection analysis to allow the government to continue to impose the burden of proof on [defendant] rather than on itself." As to due process, defendant contends there was no "tactical reason" for trial counsel's claimed failure, because "[p]lainly it would have been beneficial to [defendant] to require the government to prove beyond a reasonable doubt that he would not take his medication or would still be dangerous even if he were taking it rather than have the burden of proof placed on [defendant]."

This argument makes no real attempt to explain how defense counsel's failure to object fell below an objective standard of reasonableness. (*Mitchell, supra*, 164 Cal.App.4th at p. 467.) In any event, since the record is silent regarding defense counsel's acquiescence in instructing the jury with CALCRIM No. 3453, if there is plausible tactical reason for defense counsel not to object, the claim of ineffective assistance of counsel fails. (*People v. Henderson, supra*, 46 Cal.App.5th at p. 549.) We can conceive of at least one. Defense counsel determined that defendant could carry the preponderance evidence burden of proof that he would continue to use medication, which contrasted favorably with the prosecution's burden of proof beyond a reasonable doubt that he had serious difficulty in controlling his dangerous behavior. In fact, the prosecutor and defense counsel highlighted in closing argument the difference between the People's higher and the defense's lesser burden. (Cf. *People v. Johnson* (2016) 62 Cal.4th 600, 654.)

We conclude that defendant has not shown ineffective of assistance of counsel.

## III

*Evidence of CONREP Facility Where Defendant Committed Sexual Assault*

Defendant contends that "[o]ver a relevance objection, the trial court allowed the government witness to testify about the conditional release program in such a way that it encouraged the jury to recommit [defendant] so he could be released through the conditional release program."

Evidence is relevant when it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "We review for abuse of discretion a trial court's rulings on relevance . . . ." (*People v. Avila* (2006) 38 Cal.4th 491, 578.)

Reviewing the testimony in question, we conclude that its import is the opposite of what defendant claims. The testimony is evidence that defendant in a less structured environment than the hospital—such as a CONREP facility—poses a substantial danger to others and has serious difficulty controlling his dangerous behavior. (CALCRIM No. 3453.) Defendant admits that "[t]o a limited extent, this evidence was relevant because [defendant] had committed his most recent offense while in the conditional release program." In fact, the entirety of testimony about CONREP was relevant on that basis.

The prosecutor in questioning Dr. Kodzic asked what CONREP was. Dr. Kodzic explained that CONREP "is a way to help individuals transition back in the community." CONREP is "a supervised program to help people go from a significant amount of structure in a hospital, to very little, to no structure in the community." Dr. Kodzic described the assistance with housing, treatment, medication, social security and addiction that a CONREP program provides.

The prosecutor then asked: "So if a person is determined to be safe or a low to nonexistent risk of danger to others if released in the community, there is a way for them to exit the hospital and go to a different program."

Defense counsel objected on relevance grounds and the trial court overruled the objection. Dr. Kodzic demurred to the suggestion that a person could be a "nonexistent risk," but testified that "the terminology that we use is that they can be safely and effectively treated in a CONREP facility. [¶] So you are right, they will, essentially, more, more likely than not be safe at a community facility."

However, Dr. Kodzic went on to testify that defendant admitted he was at a CONREP facility when he committed sexual battery. Dr. Kodzic related that defendant in describing the crime was inconsistent with records, inconsistent as to whether his bipolar disorder contributed to the act, and minimized his responsibility. Defendant's inconsistency in his story was problematic because it affected assessment of risk that he would do again what he did before.

In closing argument, the prosecutor suggested that if released into the community, defendant would reoffend: "What did [defendant] do when given the opportunity to be on the outside, to take that step from the hospital and go to CONREP? He offended again and went back to the hospital."

This evidence did not suggest that defendant would be safe if released to a CONREP facility, as he argues, and offer an alternative to the jury to extend his commitment in a hospital where a determination could be made whether he qualified for CONREP. To the contrary, the evidence tended to show that defendant was at risk of reoffending as result of his mental condition in any environment outside the structure of the hospital, including at a CONREP facility. This evidence was therefore relevant to whether his commitment to Atascadero State Hospital should be extended another two years. We find no abuse of discretion.

## DISPOSITION

The order extending defendant's commitment is affirmed.

/s/
RAYE, P. J.

We concur:


/s/
BLEASE, J.


/s/
HOCH, J.