Filed 10/9/25  P. v. Obelton CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C100961 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CR-FE-COD-2021-0007811) |
| v. | |
| RONELL OBELTON, | |
| Defendant and Appellant. | |

An ongoing noise dispute at an apartment complex escalated into a fistfight between the brother of defendant Ronell Obelton and a neighbor.  During the fight, defendant retrieved a firearm and shot the neighbor multiple times at close range. Defendant then fled the scene, firing additional shots as he ran.  Defendant was arrested and charged with first degree murder and unlawful possession of a firearm.  At trial, defendant conceded that he shot the victim but claimed he did so only to save the life of his medically-compromised brother.

The jury rejected the murder charge and found defendant guilty of the lesser-included offense of voluntary manslaughter.  Defendant appeals his conviction, arguing that the trial court erred and violated his constitutional rights when it inadequately responded to the jury's questions during deliberations about the instructions for justifiable

1

homicide and imperfect self-defense.[1]  We conclude that defendant forfeited one claim of error and that the other lacks merit.  Therefore, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Prosecution Case*

The incident in this case arises from an ongoing noise dispute between upstairs and downstairs neighbors in an apartment building.  In April 2021, D.J.,[2] the victim, shared a first-floor apartment with his girlfriend, S.H., within the Waterfield Square apartment complex in Stockton, California.  The victim and S.H. were frequently disturbed by excessive noise from their upstairs neighbors.  M.P., the tenant of the upstairs apartment, shared two children with defendant, who periodically stayed at her apartment.

In the months preceding the incident, S.H. and the victim attempted to resolve the dispute with their upstairs neighbors by, among other things, lodging complaints with their upstairs neighbors, the apartment manager, and local police.  The complaints did not help and sometimes seemed to make the situation worse.

On April 4, 2021, S.H. was awakened repeatedly by loud noises coming from M.P.'s apartment.  This led to a shouting match between the victim and defendant's brother, J.O., as they stood on their outdoor patios.  During the argument, J.O. said, " '[i]f you want to do something about it, step out your front door and do something about it.' " The victim shouted something back, then exited his front door.

J.O. came downstairs to meet the victim, who was standing in the walkway in front of his apartment.  J.O. and the victim briefly argued and then began fighting.

---

[1]    Although this case involves a claim of imperfect defense of others, for convenience we adopt the parties' convention of referring to the doctrine as "imperfect self-defense."

[2]    To protect their privacy, we will refer to the victim, witnesses, and other individuals by their initials.  (Cal. Rules of Court, rule 8.90(b) (4) (10) & (11).)

Witnesses gave conflicting accounts of the fight. One witness saw the two men grappling with each other, but did not see any punches thrown. Another witness testified that the men began pushing each other, with the victim pushing J.O. to the ground, and after J.O. got up, they started punching. Other witnesses testified that the victim dominated the fight, punching J.O. numerous times as he lay on the ground.

As the fight progressed, defendant emerged from the upstairs apartment, wearing a black hoodie and carrying a red jacket or sweatshirt, which concealed a handgun with a high-capacity drum magazine. According to one witness, defendant jabbed the victim in the back with the gun, prompting the victim to say, "[n]o, one on one." Defendant then jabbed the victim again and said, "[T]here won't be no fighting . . . or no talking today," or something to that effect. At this point, defendant stepped back and fired a shot at the victim, paused, and then fired several more shots. The victim fell to the ground and eventually died from his wounds. The autopsy revealed that the victim suffered 13 gunshot wounds to his abdomen, chest, back, left arm, and right leg. Five of the shots were fatal, and four of the shots were fired with the gun muzzle between one and three feet away.

After the shooting, defendant and J.O. fled the scene. M.P. was stopped by police while attempting to leave the apartment complex. She had a cell phone in her hand and was speaking with defendant. When questioned by police, M.P. initially lied and claimed that two men named "Kevin" and "Moses" were responsible for the shooting. Upon further questioning, M.P. admitted that defendant and his brother, J.O., were the men involved in the altercation with the victim.

B.   *Defense Case*

At trial, the defense pursued a theory of justifiable homicide or, in the alternative, imperfect self-defense (defense of another), arguing that defendant shot and killed the victim because defendant actually and reasonably believed his brother's life was in danger.

3

The defense introduced evidence showing that, leading up to the incident, the victim and S.H. showed signs of frustration and aggression towards their upstairs neighbors. On one occasion, the victim sent S.H. a text message stating that he wanted to "merk the fools upstairs." S.H. understood "merk" to be an "aggressive" term.

In his own defense, defendant testified that he was at M.P.'s apartment on April 4, 2021, when he heard pounding coming from the downstairs apartment. He and J.O. went out on the balcony to figure out what was going on and discovered that their downstairs neighbors were also outside. J.O. had a conversation with the victim but defendant denied that he or J.O. got angry or raised their voices. J.O. then went downstairs to speak with the victim.

When defendant heard the conflict escalating, he testified that he grabbed his handgun and quickly went downstairs to investigate. Defendant attempted to stop the fighting by grabbing the victim and telling him to "[s]top." The victim responded, "[o]ne on one." Defendant told the victim to stop more than once in a normal conversational tone. The victim did not stop, so defendant poked the side of the victim's stomach with the gun. The victim continued to attack J.O. while straddling him as J.O. lay on the ground. Believing that his brother's life was in danger, defendant shot the victim once to stop him. When the single shot did not stop the victim, defendant shot him several more times at close range. After the incident, defendant fled because he was scared.

The defense elicited testimony that the victim, standing about six feet tall and weighing approximately 310 pounds, had a distinct size advantage over J.O., who had a slender build and weighed between 125 and 200 pounds. The defense also presented expert testimony showing that J.O. was born with a congenital heart defect, which resulted in several open-heart surgeries. The expert testified that J.O.'s surgeries made his chest bone more vulnerable to breaking. Even one blow to his chest could cause cardiac arrest and even death. The expert further explained that J.O.'s heart condition caused breathing difficulties and made him susceptible to cardiac arrhythmia.

4

C.       *Verdict and Sentencing*

In an amended information, the district attorney charged defendant with murder (Pen. Code,[3] § 187; count 1) and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2).  As an enhancement to the murder count, the information further alleged that defendant personally used a firearm (§§ 12022.53, subd. (b), 12022.5, subd. (a)); personally and intentionally discharged a firearm (§ 12022.53, subd. (c)); and personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)).

A jury found defendant not guilty of murder, but guilty of the lesser and included offense of voluntary manslaughter (§ 192, subd. (a)), and guilty of possession of a firearm by a felon.  The jury found true the allegation that defendant used a firearm during the commission of the felony (§ 12022.5, subd. (a)).  The trial court found two aggravating factors true following a bench trial.  The trial court sentenced defendant to 21 years in prison, consisting of the upper term of 11 years as to count 1, plus a consecutive 10-year term for the firearm enhancement.  The trial court imposed a concurrent middle term sentence of two years for count 2.  Defendant filed a timely notice of appeal.

DISCUSSION

I

*Claims of Instructional Error*

Defendant contends the trial court erred in responding to two jury questions during deliberations concerning the defense theories of justifiable homicide and imperfect defense of another.[4]  Defendant argues the trial court's responses were inadequate because they failed to eliminate potential confusion about the burden of proof for

---

[3]     Undesignated section references are to the Penal Code.

[4]     Imperfect defense of others is not a true defense, but a shorthand description for a form of voluntary manslaughter.  (*People v. Trujeque* (2015) 61 Cal.4th 227, 271.)

5

justifiable homicide and the role of excessive force in imperfect self-defense. Defendant further contends that the court's instructional errors, amplified by the prosecutor's "misstatements and misleading rhetoric," prejudiced his case and violated his constitutional rights to due process, to a fair trial, and to present a defense. As discussed below, we conclude that defendant forfeited one claim of error and that the other fails on the merits.

A. *Additional Background*

At the close of the trial, the trial court instructed the jury on, among others, the principles of justifiable homicide based on defense of another (CALCRIM No. 505) and voluntary manslaughter based on imperfect defense of another (CALCRIM No. 571).

With CALCRIM No. 505, the jury was instructed that the killing was justified if defendant reasonably believed that he or another person was in imminent danger of being killed or suffering great bodily injury; reasonably believed that immediate deadly force was necessary to defend against that danger; and used no more force than was reasonably necessary to defend against that danger. The jury was instructed that the People have the burden of proving beyond a reasonable doubt that the killing was not justified.[5]

With CALCRIM No. 571, the jury was instructed that a killing that otherwise would be murder is reduced to voluntary manslaughter if the defendant actually believed that he or another person was in imminent danger and that the immediate use of deadly force was necessary, but at least one of those beliefs was unreasonable. Further, the jury was instructed that the People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect defense of another.

---

[5] The jury also was instructed with CALCRIM No. 3474 that "[t]he right to use force in defense of another continues only as long as the danger exists or reasonably appears to exist. When the attacker withdraws or no longer appears capable of inflicting any injury, then the right to use force ends."

6

During closing argument, the prosecution addressed both instructions, telling the jury that its "job" was to "prove beyond a reasonable doubt that one . . . or more [of the three elements of justifiable homicide] does not apply. [¶] If you find that one of these is not true, that it's been proven to you beyond a reasonable doubt that it's not true, then you have determined . . . that this is not [justifiable homicide]." The prosecution also told the jury that the difference between justifiable homicide (lawful defense of another) and imperfect self-defense is whether the defendant's belief in imminent danger and the need to defend with deadly force was reasonable.

Defense counsel likewise told the jury—repeatedly—that the jury must "decide whether or not the People proved beyond a reasonable doubt" that the defendant was not acting in (perfect or imperfect) defense of another. Defense counsel specifically reviewed the elements of CALCRIM No. 505 and emphasized that it is the prosecution's burden to prove the killing was not justified.

On the third day of deliberations, the jury presented a note with two questions: (1) "[Do] the [P]eople have to prove all 3 or only 1 in CALCRIM [No.] 505?" (2) "For imperfect self-defense, does excessive force play a role?" In response to the first question, defense counsel suggested the trial court reinstruct the jury with CALCRIM No. 505. The following colloquy then ensued:

"[THE COURT]: No. They are asking that–I think when [the prosecutor] did his closing, he said if you find that one of these is not reasonable, one of these three bullet points, then it's not justifiable homicide. And that's a correct statement of the law.

"[DEFENSE COUNSEL]: Right. But there's a lot more to that instruction than just those three bullet points. And so I'm afraid that anything other than referring them back to the instruction is going to invite them to disregard the remainder of the instruction.

"[THE COURT]: All right.

"[DEFENSE COUNSEL]: So I'll just put that on the record.

7

"[THE COURT]: That's fine. Their question specifically references the three bullet points. So I will tell them what I said I'm going to tell them. And I'll also remind them to read–read all the instructions together. And, you know, carefully reread [CALCRIM No.] 505. But for homicide to be justified, all three of those have to be present.

"[DEFENSE COUNSEL]: I would–I would at least ask the Court to include that the People must prove beyond a reasonable doubt that all three of those are not present.

"[PROSECUTOR]: That's not accurate.

"[THE COURT]: No. That's not accurate."

"[DEFENSE COUNSEL]: Or at least–"

"[THE COURT]: They have to prove beyond a reasonable doubt–if they prove beyond a reasonable doubt that one of these three is not present, then it's not justifiable."

In response to the second question, the trial court proposed to reinstruct the jury with CALCRIM No. 571, and both attorneys agreed with this response.

The trial court then recalled the jury. In answer to the first question about CALCRIM No. 505, the court told the jury: "[T]he defendant–the People have the burden of proving beyond a reasonable doubt that this was not justified. However, for you to find that the defendant was justified, you have to find that all three of these elements are met for it to be justifiable homicide. All three have to be met. So again, the burden is on the People, but the–for the defendant to benefit from a justifiable homicide, all three of those have to be met."

Following a short bench conference, the trial court added: "So another way of saying this is that if the People have proved beyond a reasonable doubt that one of the elements is not met, then you do not have justifiable homicide. So if one of those three, [the prosecutor] proves beyond a reasonable doubt is not there, then you don't have justifiable homicide."

8

In answer to the jury's second question, the trial court re-read CALCRIM No. 571 in its entirety. The jury then resumed deliberations.

Later that morning, the parties reconvened to discuss another jury question. At that time, defense counsel expressed concerns about the phrasing of the trial court's response to the justifiable homicide question. Defense counsel stated: "I'm concerned because the Court initially said that all three had to be met for it to be justifiable. And then we approached and then the Court said it another way, the People must prove beyond a reasonable doubt one was not met. I'm confused–or I'm concerned that because we didn't say, you know, strike that, that first explanation was wrong, it sounds like we were just clarifying that. And if anyone was left with the impression that all three had to be met, that would shift the burden to us to prove self-defense, when it's really the People must disprove it. So I'm just wondering if we should let them know all three don't have to be met. I want to make sure that's clear. It's that the People must prove beyond a reasonable doubt. . . . [¶] And I also–with respect to the [statement that the] People must prove beyond a reasonable doubt one was not met, again that makes it sound like we had to prove one was met. Whereas . . . there just has to be . . . proof beyond a reasonable doubt, meaning if it's even a reasonable possibility, . . . so I'm just afraid that we've confused this more than we've clarified it for them."

The trial court declined to revisit its prior response, stating, "I'm not going to address [CALCRIM No.] 505 any more. I think it was clear. Your objections have been made."

B.      *Standard of Review*

After a jury retires to deliberate, section 1138 imposes upon the court a duty to help the jury understand the legal principles it is asked to apply. (*People v. Franklin* (2018) 21 Cal.App.5th 881, 887; *People v. Beardslee* (1991) 53 Cal.3d 68, 97; § 1138.) "This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under

9

section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] Indeed, comments diverging from the standard are often risky. [Citation.] . . . But a court must do more than figuratively throw up its hands and tell the jury it cannot help. It must at least *consider* how it can best aid the jury. It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given." (*Beardslee,* at p. 97.)

We apply the abuse of discretion standard to any decision by a trial court to instruct, or not instruct, in the exercise of its supervision over a deliberating jury. (*People v. Waidla* (2000) 22 Cal.4th 690, 745-746.) However, "[w]e review de novo the legal accuracy of any supplemental instructions provided." (*People v. Franklin, supra,* 21 Cal.App.5th at p. 887, fn. 4; see *People v. Posey* (2004) 32 Cal.4th 193, 218.) In reviewing a claim that a court's instructions were incomplete or misleading, we must independently determine whether there is a reasonable likelihood that the jury construed or applied the challenged instructions in a manner contrary to law. (*People v. Olivas* (2016) 248 Cal.App.4th 758, 772.) In conducting our review, we look to the instructions as a whole and the entire record of the trial, including the arguments of counsel, and we assume that jurors are intelligent persons capable of understanding and correlating all instructions given. (*People v. Lopez* (2011) 198 Cal.App.4th 698, 708.) Instructions should be interpreted to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation. (*Ibid*.)

C.      *Analysis*

1.      *Justifiable Homicide*

Defendant asserts the trial court provided a legally inadequate response to the jury's question about CALCRIM No. 505. In particular, when the jury asked about the justification defense, defendant contends the trial court misstated the law by saying the jury had to "find that all three of [the] elements are met," implying the defense bore the burden to prove justification. Defendant contends the court's subsequent clarification—

10

that " 'if the People have proved beyond a reasonable doubt that one of the elements is not met, then you do not have justifiable homicide' "—was "technically accurate, but not sufficient to cure the [jury's] confusion" because the court never instructed the jury to disregard the initial, flawed response. Further, defendant claims the prosecutor's "misleading" statements during the closing argument amplified the trial court's instructional error and increased the likelihood that jurors misunderstood and misapplied the law.

The People contend that defendant forfeited this contention by failing to contemporaneously object, but we find no forfeiture. The record shows that when the trial court refused to reinstruct the jury with CALCRIM No. 505, defense counsel objected that "there's a lot more to that instruction than just those three bullet points. And so I'm afraid that anything other than referring them back to the instruction is going to invite them to disregard the remainder of the instruction." Later that morning, defense counsel voiced her concerns again, at a point when an admonition still could have remedied the harm defendant claims he suffered. For these reasons, we reject forfeiture.

On the merits, however, we agree with the People that the trial court's instructions properly instructed the jury on justifiable homicide. We discern no reasonable probability that the jury was misled about the prosecution's burden of proof. We reach this conclusion for several reasons.

To begin, the trial court instructed the jury with CALCRIM No. 505, which accurately conveyed the applicable law. (*People v. Lopez* (2011) 199 Cal.App.4th 1297, 1307; see *People v. Waxlax* (2021) 72 Cal.App.5th 579, 591.) CALCRIM No. 505 advised the jury of the three elements of justifiable homicide and clearly told the jury that "[t]he People have the burden of proving beyond a reasonable doubt that the killing was not justified." (CALCRIM No. 505.) Further, during closing arguments, both parties repeatedly told the jury that it was the prosecution's burden to prove the killing was not

11

justified, and made clear that the prosecution could carry this burden by proving beyond a reasonable doubt that at least one element of justifiable homicide has not been met.

The jury's question during deliberations showed that it understood the People had the burden of proof: "[Do] the [P]eople have to prove all 3 or only 1 [element] in CALCRIM [No.] 505?" As the trial court found, the jury simply was confused about *what precisely the prosecution must prove* to meet its burden. Specifically, the jury was confused whether the People were required to prove the absence of all three elements of CALCRIM No. 505, or only one, to show the killing was not justified.

The trial court appropriately addressed the jury's question by (1) reminding the jury that it is the prosecution's burden to prove beyond a reasonable doubt that the killing was not justified, and (2) explaining that "[a]ll three [elements] have to be met" for a killing to be justified. This instruction was sufficient for any reasonable juror to infer that the People can carry their burden by proving beyond a reasonable doubt that one or more of the three elements in CALCRIM No. 505 has not been met, or stated differently, that the People are only required to disprove one element in CALCRIM No. 505 to negate a justifiable homicide defense. (See, e.g., *Whitaker v. Holbrook* (W.D.Wash. Mar. 19, 2020, No. C19-1167-JCC-MAT) 2020 U.S.Dist.LEXIS 69134, pp. *8-16.) Thus, we do not agree that the trial court's initial response to the jury "misstated" the law or "incorrectly" suggested the defense had the burden of proof, as defendant argues.

Having adequately instructed the jury, the trial court was not required to give any further clarifying instructions. (See *People v. Ocegueda* (2023) 92 Cal.App.5th 548, 560.) However, even if we assume there was some ambiguity in the trial court's initial response, it was undoubtedly eliminated by the court's clarification that "another way of saying this is that if the People have proved beyond a reasonable doubt that one of the elements is not met, then you do not have justifiable homicide." This was a correct statement of the law, as defendant concedes.

There is no reasonable likelihood that the jury was confused or misled by the given instructions. Thus, we find no instructional error and no violation of any of defendant's constitutional rights. (*People v. Avila* (2006) 38 Cal.4th 491, 596.)

> 2. *Imperfect Self-Defense*

Defendant also argues that the trial court erred in responding to the jury's question on how excessive force relates to imperfect self-defense. Defendant contends the trial court should have explained that excessive force does not categorically preclude imperfect self-defense when the defendant honestly but unreasonably believed deadly force was necessary. Defendant contends that this instructional error, combined with the prosecution's "inflammatory" remarks during closing,[6]could have caused jurors to reject imperfect self-defense based on the "mistaken assumption" that using excessive force nullifies it.

The People counter that defendant forfeited the claim on appeal through acquiescence in the trial court's response. We agree with the People.

"When the trial court responds to a question from a deliberating jury with a generally correct and pertinent statement of the law, a party who believes the court's response should be modified or clarified must make a contemporaneous request to that effect; failure to object to the trial court's wording or to request clarification results in forfeiture of the claim on appeal." (*People v. Dykes* (2009) 46 Cal.4th 731, 802.) A party may not complain on appeal that an otherwise correct instruction was too general or incomplete unless the party made an appropriate objection. (*People v. Guiuan* (1998) 18 Cal.4th 558, 570; *People v. Mejia* (2012) 211 Cal.App.4th 586, 617.)

---

**6** Defendant quotes specific statements allegedly made by the prosecution during closing argument. However, neither the People nor this court could find the cited passages in the record. To the extent the prosecution made such statements, defendant's citations are incorrect.

13

Here, the trial court instructed the jury on imperfect self-defense with CALCRIM No. 571, which has been upheld as a correct statement of the law. (*People v. Lopez*, *supra*, 199 Cal.App.4th at p. 1307; *People v. Howard* (2024) 104 Cal.App.5th 625, 662; see *People v. Manriquez* (2005) 37 Cal.4th 547, 581; *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1178.) The pattern instruction set forth the principles of imperfect self-defense and explained that (1) a killing that otherwise would be murder is reduced to voluntary manslaughter if the defendant acted in imperfect self-defense; (2) the difference between complete self-defense (justifiable homicide) and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable; and (3) the jury could return a verdict of voluntary manslaughter even if the defendant used unreasonable (hence "excessive") deadly force.

Any further clarification on the use of excessive force amounted to a pinpoint instruction, which the trial court was not required to provide without a request. (*People v. Rogers* (2006) 39 Cal.4th 826, 878-879; *People v. Garvin* (2003) 110 Cal.App.4th 484, 488-489.) Defense counsel made no such request. In response to the jury's question, the trial court proposed to respond by reinstructing the jury with CALCRIM No. 571. Defense counsel consented to the trial court's response. Counsel did not ask for any clarifying or amplifying language explaining how excessive force relates to imperfect self-defense. Thus, any claim of error with respect to the court's response is forfeited on appeal. (*People v. Salazar* (2016) 63 Cal.4th 214, 248-249; *People v. Bohana* (2000) 84 Cal.App.4th 360, 373; *People v. Zepeda* (2018) 26 Cal.App.5th 211, 216, fn.7.)

Forfeiture may be excused when an alleged instructional error affected the defendant's substantial rights. (*People v. Cardona* (2016) 246 Cal.App.4th 608, 612; § 1259.) Cases equate "substantial rights" with reversible error under the test stated in *People v. Watson* (1956) 46 Cal.2d 818. (*Cardona*, at p. 612.) Thus, an instructional error affects a defendant's substantial rights only if it is reasonably probable that the

defendant would have obtained a more favorable outcome absent the error. (*People v. Elsey* (2000) 81 Cal.App.4th 948, 953, fn. 2.)

Here, we conclude that defendant's substantial rights were not affected because it is not reasonably probable that he would have achieved a more favorable outcome if the trial court had given the requested pinpoint instruction. As discussed, CALCRIM No. 571 correctly stated the law. It told the jury that a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed in the actual but unreasonable belief that the immediate use of deadly force was necessary to defend against imminent danger of death or great bodily injury. (CALCRIM No. 571.) Under this instruction, the jury could find defendant guilty of voluntary manslaughter even if he used excessive force, provided it found he actually but unreasonably believed the use of deadly force was necessary to defend against imminent danger of death or great bodily injury.[7]

Further, any claimed error was harmless because the jury found defendant guilty of voluntary manslaughter—the same verdict defendant would have received if the jury had received the additional instruction and credited his theory of imperfect self-defense. It is not reasonably probable that the jury would have returned a different, more favorable verdict had the jury been given the requested pinpoint instruction.

Because defendant's substantial rights were not affected, his failure to object forfeited the claim of error. (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 465.)

---

[7]     If the defendant's belief in the need to use deadly force was unreasonable, "then by definition the use of deadly force would be excessive." (*People v. Morales* (2021) 69 Cal.App.5th 978, 996, fn. 5.)

DISPOSITION

The judgment is affirmed.

\s\
Krause, Acting P. J.

We concur:

\s\
Mesiwala, J.

\s\
Wiseman, J.*

---

*     Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.